# Richmond

### CATHERINE WEBB v. COMMONWEALTH OF VIRGINIA.

January 14, 1963.

Record No. 5467.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, l'Anson and Carrico, JJ.

The opinion states the case.

*William McL. Ferguson* and *Ralph T. Baker* (*Ferguson, Harvell & Young,* on brief), for the plaintiff in error.

*M. Harris Parker, Assistant Attorney General* (*Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

I'ANSON, J., delivered the opinion of the court.

The defendant, Catherine Webb, was indicted on June 13, 1960, for embezzling and converting to her own use, during the period beginning January 1, 1952, and ending February 6, 1959, the sum of $18,030.93 of the funds of her employer, Bowen Company, Inc., trading as Bowen Company. In asking for a conviction the Commonwealth relied on § 18.1-109[1] (formerly § 18-171) Code of 1950, 1960 Replacement Volume. Defendant pleaded not guilty, waived trial by jury, and was found guilty as charged in the indictment. Her punishment was fixed at three years in the State penitentiary, of which two years were suspended and she was sentenced to the penitentiary for a period of one year. From this judgment and sentence entered on September 18, 1961, we granted the defendant a writ of error.

---

1. "§ 18.1-109. *Embezzlement deemed larceny; indictment; statement from attorney for the Commonwealth.*—If any person wrongfully and fraudulently use, dispose of, conceal or embezzle any money, bill, note, check, order, draft, bond, receipt, bill of lading or any other personal property, tangible or intangible, which he shall have received for another or for his employer, principal or bailor, or by virtue of his office, trust, or employment, or which shall have been entrusted or delivered to him by another or by any court, corporation or company, he shall be deemed guilty of larceny thereof, and may be indicted as for simple larceny. But proof of embezzlement under this section shall be sufficient to sustain the charge. On the trial of every indictment for larceny, however, the defendant, if he demands it, shall be entitled to a statement in writing from the attorney for the Commonwealth of what statute he intends to rely upon to ask for conviction."

The defendant principally contends that the trial court erred: (1) In denying her motion made before arraignment to quash the indictment on the grounds that the Commonwealth failed to grant her a preliminary hearing as required by § 19.1-163.1[2], Code of 1950, 1960 Replacement Volume, and the constitutional guarantees of "due process" and "equal protection" of the laws under § 1 of the Fourteenth Amendment to the Constitution of the United States and § 8 of the Constitution of Virginia; (2) In denying her motion to strike the Commonwealth's evidence purporting to show an act or acts of embezzlement occurring more than six months prior to other alleged acts of embezzlement beginning on January 1, 1956, the admission of said evidence being in violation of § 19.1-168 of the Code of 1950, 1960 Replacement Volume; (3) In admitting certain opinion testimony; and (4) In finding her guilty on evidence which was insufficient to support the conviction.

Seven days were consumed in the trial of the case and the printed record is voluminous, covering 865 printed pages. It will serve no useful purpose to undertake to set out in this opinion all of the facts as disclosed by the Commonwealth's evidence. The defendant offered no evidence except that of good character.

The pertinent evidence shows that the defendant was employed in 1949 as a secretary in the office of W. C. Bowen, trading as W. C. Bowen Company, whose business was that of general insurance and real estate management. Several months after she was employed the firm's bookkeeper resigned her position on account of a shortage in her accounts, and the defendant was assigned the duty of keeping the books. She received such instruction as she had for this type of work from E. D. Whiteside, business consultant of the Bowen firm, and G. Keith McMurran, its vice president and general manager. It was a part of the defendant's duty to receive payments from the firm's insurance customers and tenants of rental property, but other employees of the firm performed the same duties. She prepared the duplicate bank deposit slips, but all the deposits were made by two other employees. Her other duties included the functions of casualty insurance secretary and rental manager.

One of the major insurance accounts of the firm was that of Citizen's Rapid Transit Company, referred to hereinafter and throughout the record as "C.R.T.", of which W. C. Bowen was a director and treasurer.

---

2. Enacted as Code § 19.1-137.1, Acts of Assembly, 1960, Ch. 389, p. 597, but section was assigned by Code Commission as § 19.1-163.1.

A cash drawer was maintained in the office in one of the desks, which was occupied exclusively by another employee until July 1, 1958, when the defendant began sharing the desk to use the dictaphone machine. The drawer was not locked, and all of the employees in the office, averaging five or six in number, not only had access to the cash drawer, but in fact, with the approval of the management, used it for the purpose of making change and receiving payments from insurance customers and tenants of the properties managed by the firm. They also had the privilege of cashing their own personal checks and those of friends and customers of the firm and of borrowing from the cash drawer and inserting a voucher or "I.O.U." to cover the amount borrowed. A person renting space in the Bowen office also cashed his checks and those of his customers from the cash drawer.

There was a petty cash fund, originally in the amount of $50, later increased to $100, and subsequently reduced to $50, which was kept in the same cash drawer and co-mingled with the daily cash receipts. Disbursements were made from the cash drawer to pay incidental expenses incurred by the company, such as janitorial and other services. Each morning the petty cash fund was brought up to its established amount out of funds from the previous day's receipts, and to this extent some of the daily receipts never became available for deposit in the firm's bank accounts.

The system of books as set up by the business consultant, E. D. Whiteside, did not provide for any formal records of actual disbursements from the cash drawer, and there were no records capable of being audited by which it could be determined how much was paid out in cash from the drawer in the legitimate discharge of the firm's obligations over the period embraced by the indictment and the preceding years. Under this system no checks were written to petty cash to reimburse the cash account for the funds so disbursed, but checks were supposed to have been drawn on the Citizen's Marine Jefferson Bank for the amount of such disbursements and to have been deposited in the same account upon which they were drawn. Of course, this procedure would not have created any new funds in the bank account, but would have provided a record of the amount of the cash disbursements.

The firm's books were a handwritten, double-entry set of books consisting of subsidiary records, journals, ledgers, etc. Most of the entries in the books were in the handwriting of the defendant, but

some were made by Whiteside, McMurran, and a young lady who was a part-time employee during the summer months.

The defendant, two other employees, and Bowen knew the combination to the firm's safe.

On the afternoon of February 5, 1959, Whiteside went to the office of Bowen Company to begin his procedure for closing the books for the year and to obtain information for the preparation of tax returns. He took a trial balance of the general ledger and found it to be in balance. The following morning, February 6, he proceeded to reconcile the subsidiary ledgers and the accounts receivable and payable, and found them to be in balance. His computation of the books disclosed that the sum of $3,953.89 should be on hand as of January 31, 1959, but he did not count the cash until the next morning, February 7, when it was found that only $258.59 was on hand. He then discovered that according to the books two deposits in the aggregate amount of $3,953.89 had been made on February 6, 1959. It had been the practice over a period of years to make the first deposit each month equal to the sum shown by the books to be on hand at the end of the previous month.

On Monday morning, February 9, Whiteside requested the defendant to turn over to him all the carbon copies of the deposit slips representing the deposits made since July 1, 1958. He chose that date because the McBee bookkeeping system was put into operation as of that time. The two slips showing the deposits made on February 6 were missing from the number handed to Whiteside and when the defendant's attention was called to it she turned them over to him. These two duplicate deposit slips showed that the deposits were in currency and coin in the total amount of $3,953.89, of which $3,384-.25 was deposited to the firm's account in the Citizen's Marine Jefferson Bank and $569.64 in its account at the First National Bank of Newport News.

Whiteside then checked the original deposit slip at the Citizen's Marine Jefferson Bank and found that of the $3,384.25 deposited, $86.89 was in currency and coin and the balance was represented by five checks. The original deposit slip at the First National Bank showed that $11.03 was in currency and coin and five checks had been deposited.

Upon being questioned by Whiteside as to why the duplicate deposit slips of February 6 showed all cash, the defendant stated that she had made up the deposits in a hurry and planned to call the bank

to get a detailed list. She later furnished him two typewritten deposit slips showing the cash and checks which were deposited.

Only two of the checks listed on the typewritten deposit slips were recorded on the Bowen Company books. One was in the amount of $794.44 and the other for $140.17. Another check, listed on the typewritten deposit slip in the amount of $145.83, and not recorded on the books, had been stamped for deposit only and had been cashed at the bank, of which $86.89 had been deposited and $58.94 had been returned to the office by the employee making the deposit.

When these matters were called to McMurran's attention he requested the defendant to cooperate with Whiteside to help "unravel the problem." He told her, however, that her services would have to be terminated within a reasonable time regardless of whether there was a shortage or inefficient bookkeeping because he had put up with her inefficiency for the past two years.

Robert L. Freeman, a certified public accountant, was engaged in February 1960, a year after the defendant's separation from the firm, to make a limited audit of its accounts. He testified that he checked some totals of the 1952 cash account and made a cash audit of the books for the years 1956, 1957, 1958, and for the period from January 1 through February 6 of 1959. The starting point of his audit was January 1, 1956, and he assumed that all accounts were correctly stated on the books as of December 31, 1955. He conceded, however, that if the books had not been properly stated at that time errors as far back as 20 years would have been carried forward and would affect his audit. The only books on which Freeman made a complete audit were those showing cash receipts and the bank deposits, and he checked the total receipts against the bank deposits and made a limited examination of some of the disbursements.

On the basis of his audit Freeman testified that the books showed a cash shortage of $17,359.18. The shortage occurring during the year 1952 was $1,667.99, and resulted from an overstatement of total credits on the insurance accounts receivable ledger of $1,667.99 and an overstatement of the total debits to insurance accounts payable in the same amount. He referred to this as an "overfooting." The alleged shortage of $12,671.91 represented the total of four checks from "C.R.T." which were deposited to Bowen Company's bank accounts but were not recorded on its accounts receivable. All "C.R.T." payments were deposited to the company's bank accounts and, except the four checks totalling $12,671.91, were recorded on

the accounts receivable ledger, although the recordation of some of them was delayed for several months. He referred to this as "lapping" the "C.R.T." accounts and stated that this practice took place during the years 1956, 1957 and 1958. The balance of the alleged shortage, $3,019.28, occurred during the period from July 1, 1958, through February 6, 1959, and was ascertained by subtracting the deposits of $214,397.57 from the receipts of $217,416.85.

The defendant repeatedly denied to Whiteside, McMurran and Bowen that she had taken any of the firm's money and agreed to take a lie detector test if everyone employed by the firm during the term of her employment would agree to do so. While the defendant maintained that she had not taken any of the money, she stated to Whiteside, McMurran and Bowen in a conference held sometime after her severance from the firm in February, 1959, that she was willing for her father to make a settlement because of her responsibility as the bookkeeper.

A representative of the Royal Globe Insurance Group, surety on defendant's bond, testified that the defendant gave him a written statement in which she denied taking any of Bowen Company's funds, and that she was upset when she made out the deposit slips of February 6 because she found the envelope in which she had placed the money and checks for deposit had been unsealed.

The defendant first contends that the denial of her right to a preliminary hearing before trial in a court of record violated § 19.1-163.1 of the Code of 1950, 1960 Replacement Volume, as well as her constitutional rights of "due process" and "equal protection" of the laws.

Section 19.1-163.1, enacted as an emergency act in 1960, reads as follows:

"No person who is *arrested* on a charge of felony shall be denied a preliminary hearing upon the question of whether there is reasonable ground to believe that he committed the offense and no indictment shall be returned in a court of record against any such person prior to such hearing unless such hearing is waived in writing." (Italics supplied.)

Since the effective date of the Code of 1887, which eliminated Chapter 463, Acts of Assembly of 1885-86, pp. 522, 523, requiring that an accused, when indicted for a felony, be sent before a justice of the peace for examination, this Court has consistently held that a preliminary examination of one accused of committing a felony is

not necessary where an indictment has been found against him by a grand jury. *Benson* v. *Commonwealth* (1950), 190 Va. 744, 749, 58 S. E. 2d 312, 314; *Jones* v. *Commonwealth*, 86 Va. 661, 10 S. E. 1005. See also 22 C. J. S., Criminal Law, § 332, p. 848; 5 Mich. Jur., Criminal Procedure, § 17, pp. 346, 347.

In the *Benson* case, *supra*, the defendant was arrested on a warrant and when he insisted upon a preliminary hearing in the police court before witnesses were allowed to appear before the grand jury, the attorney for the Commonwealth dismissed the warrant. Defendant was later indicted by the grand jury, and we held that he had no right, either statutory or constitutional, to a preliminary hearing prior to the finding of the indictment or his trial thereon.

It may reasonably be assumed from the language used in § 19.1-163.1 that it was enacted to change the effect of our holding in the *Benson* case by granting an accused the right to a preliminary hearing when he has been arrested on a warrant charging a felony before an indictment may be returned by a grand jury.

But under the procedure followed in the present case the statute has no application. It applies to a person who has been arrested on a felony charge prior to an indictment by a grand jury. Here the defendant had not been arrested or charged with any offense prior to the return of the indictment.

The primary purpose of a preliminary hearing is to ascertain whether there is reasonable ground to believe that a crime has been committed and the person charged is the one who has committed it. 22 C. J. S., Criminal Law, § 331, pp. 844, 845; 14 Am. Jur., Criminal Law, § 241, p. 935. The grand jury here found that there was reasonable cause to believe that the defendant had committed a felony before she was arrested and its action preempted the defendant's right to a preliminary hearing.

Code § 19.1-163.1 allows a preliminary hearing to be waived in writing. Thus the requirement of a preliminary hearing of one arrested on a charge of a felony is not jurisdictional, and its denial does not violate the "due process" and "equal protection" of the law clauses of § 1 of the Fourteenth Amendment to the Constitution of the United States and § 8 of the Constitution of Virginia. *Benson* v. *Commonwealth, supra*, 190 Va. at p. 749, 58 S. E. 2d at p. 314.

Hence the trial court did not err in overruling defendant's motion to quash the indictment.

The defendant says that the court should have stricken the

evidence of the alleged shortage of $1,667.99, which occurred in 1952, because it was a separate and distinct act occurring more than six months from the next act charged in a single count of the indictment in contravention of Code § 19.1-168.

The pertinent part of § 19.1-168 reads as follows:

"In a prosecution against a person accused of embezzling or fraudulently converting to his own use bullion, money, bank notes or other security for money it shall be lawful in the same indictment or accusation to charge and thereon to proceed against the accused for any number of distinct acts of such embezzlements or fraudulent conversions which may have been committed by him within six months from the first to the last of the acts charged in the indictment; * * *."

This Court has not heretofore construed the language of the statute relative to the point in issue. However, the Supreme Court of West Virginia has construed a statute of that State containing language which is practically the same as that of our statute. In *State* v. *Wetzel*, 75 W. Va. 7, 83 S. E. 68, 72, 73, Ann. Cas. 1918A, 1074, the Court held that an indictment charging an accused with embezzling money over a period of more than three years, stating the aggregate amount of such various sums, charges a continuous plan or scheme and a single offense of embezzlement and does not contravene the statute. See also *Jackson* v. *State*, 76 Ga. 551.

But under the evidence in the instant case the alleged shortage of $1,667.99 occurred during the year 1952. The alleged acts occurring during that period were not a part of a continuous plan or scheme extending through February 6, 1959, so as to constitute a single offense. This is manifest in that all the other evidence is limited to the period beginning in January 1956, three years after the year 1952. Since one cannot be lawfully charged with more than one offense in a single count (*Pine* v. *Commonwealth*, 121 Va. 812, 830, 93 S. E. 652, 657) the court erred in not striking the evidence relating to the alleged embezzlement occurring during the year 1952 because it was not a part of the alleged scheme or plan to embezzle beginning more than six months thereafter.

■ The defendant next says that the trial court should not have received opinion testimony from the witness Whiteside as to the ultimate facts at issue.

In answer to a question propounded by the attorney for the Commonwealth, the witness Whiteside was allowed to testify that the

"effect" of the two deposit slips prepared by the defendant on February 6, 1959, which contained unrecorded receipts on the books, was that since they indicated that there was a shortage "they had to replace funds from other customers which had been removed." The witness's answer went beyond merely stating what the books showed. It had the effect of stating a conclusion that the unrecorded receipts were used to replace funds converted by the defendant to her own use, which is the very issue in this case.

It is generally held that while an expert witness may be permitted to express his opinion relative to the existence or nonexistence of facts not within common knowledge, he cannot give his opinion upon the precise or ultimate fact in issue, which must be left to the jury or the court trying the case without a jury for determination. *Mitchell* v. *Commonwealth*, 141 Va. 541, 565, 127 S. E. 368, 376; *Thornton* v. *Commonwealth*, 113 Va. 736, 744, 745, 73 S. E. 481, 484, 485; *Ramsey* v. *Commonwealth*, 200 Va. 245, 249, 250, 251, 105 S. E. 2d 155, 158, 159, 160; 20 Am. Jur., Evidence, § 782, pp. 653, 654.

In *Mitchell* v. *Commonwealth, supra,* involving the prosecution of a bank officer for making entries with the intent to conceal the true facts of his account, we said:

"It is assigned as error that the trial court, over the objection of the accused, permitted a witness for the Commonwealth to be asked and to answer the following question: 'Will you state whether or not the effect of such entries made upon the books of the bank would be to conceal the true state of the account of John Mitchell, Jr., in the bank?' To which the witness replied, 'Yes.' The question was a leading one put to a witness not shown to be an expert. But whether expert or not, it calls for the opinion of the witness of what was practically the very issue to be tried by the jury, and not to what was disclosed by the books of the bank. He was asked as to the 'effect' of such entries. This was a question to be determined by the jury from the evidence in the case and not from the opinion of an adverse witness. In *Thornton* v. *Commonwealth*, 113 Va. 736, 73 S. E. 481, the case was reversed solely on the ground that a very similar question was allowed to be asked an expert witness." 141 Va. at p. 565, 127 S. E. at p. 376.

Thus it was error to receive the opinion testimony from the witness Whiteside.

■ The final question raised by the defendant was that the evidence was not sufficient to warrant a conviction.

Where the Commonwealth, in a criminal case, undertakes to prove the guilt of the accused by circumstantial evidence, as it did in the present case, not only must it prove the circumstances, but it must overcome the presumption of innocence and establish his guilt beyond a reasonable doubt. All necessary circumstances proved must be consistent with guilt and inconsistent with innocence. It is not sufficient that the evidence create a suspicion of guilt, however strong, or even a probability of guilt, but must exclude every reasonable hypothesis save that of guilt. To accomplish that the chain of circumstances must be unbroken and the evidence as a whole must be sufficient to satisfy the guarded judgment that both the *corpus delicti* and the criminal agency of the accused have been proved to the exclusion of any other reasonable hypothesis and to a moral certainty. The inferences to be drawn from proved facts are within the province of the jury, or the court trying the case without a jury, so long as the inferences are reasonable and justified. *LaPrade* v. *Commonwealth*, 191 Va. 410, 418, 61 S. E. 2d 313, 316; *Smith* v. *Commonwealth*, 185 Va. 800, 820, 821, 40 S. E. 2d 273, 282, 283; *Toler* v. *Commonwealth*, 188 Va. 774, 780, 781, 51 S. E. 2d 210, 213; *Van Dyke* v. *Commonwealth*, 196 Va. 1039, 1045, 1046, 86 S. E. 2d 848, 851; 7 Mich. Jur., Evidence, § 40, p. 380.

To constitute the statutory crime of embezzlement it is necessary to prove that an accused wrongfully appropriated to his own use or benefit, with the intent to deprive the owner thereof, the property of another which has been entrusted to him by reason of his employment or office. *Lee* v. *Commonwealth*, 200 Va. 233, 235, 236, 105 S. E. 2d 152, 154; 6 Mich. Jur., Embezzlement, § 3, p. 676.

A bookkeeper cannot be held criminally liable for embezzling funds merely because the funds received had not been deposited where there is an obvious lack of internal control and where persons other than the accused received funds and made some entries in the accounts in the absence of a showing that he converted the funds to his own use. See *Rast* v. *State*, 79 Fla. 772, 84 So. 683, 687.

Measured by the law as above stated, we are of opinion that the evidence is not sufficient to support the conviction. The only evidence of a shortage was based on the fact that the deposits and cash on hand over the period in question did not equal the cash receipts as shown on the books. The audit made by the accountant, Freeman, which was made more than a year after defendant's employment had been terminated, consisted of only an audit of the cash receipts account and deposits and certain items in other accounts. He assumed

that the balances as of January 1, 1956, which was the starting point of his audit, had been properly stated. He conceded that errors occurring over a period of twenty years would be carried forward, and a lack of proper internal control would affect the correctness of his audit.

There was a glaring weakness in the system of the internal control. All of the employees of the office received payments on accounts, made change from the cash drawer, borrowed money from it, and cashed their own checks and those of customers out of the cash drawer. Four persons connected with the firm knew the combination of the safe. Some entries were made in the books by persons other than the defendant. Incidental expenses of the firm were paid out of the daily receipts from the cash drawer, and under the system set up by Whiteside no records, which could be audited, were kept of those expenses. Hence under this system all receipts were not deposited in the bank. This could account for the difference between receipts and deposits and the amount of cash on hand. It is impossible to establish a shortage of funds for which the defendant would be responsible without a detailed audit of the firm's books showing all receipts and disbursements.

While the late recordation of receipts on the books of the firm creates a suspicion that the books may have been manipulated by the defendant, suspicion alone cannot support a conviction. This may well be attributed to the bookkeeping system and the inefficiency of the defendant as a bookkeeper. There was positive evidence that she had been inefficient for the two years immediately preceding the termination of her employment in February, 1959. Hence, the defendant's failure to record certain checks in the firm's books prior to depositing them in its bank accounts does not under the circumstances establish that she converted to her own use other funds of the firm equal to the amount of the checks deposited.

For the reasons stated, we think the judgment of conviction should be reversed and the case remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*