## Richmond

### CARL DONALD SMITH

### V.

### COMMONWEALTH OF VIRGINIA

October 16, 1981.

Record No. 801893.

Present: All the Justices.

*J. Gray Lawrence, Jr.; Augustus Anninos (Howell, Anninos, Daugherty & Brown,* on brief), for appellant.

*Robert E. Bradenham, II, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

Carl Donald Smith, convicted in a bench trial of grand larceny by embezzlement, asks us to hold that the evidence was insufficient to support the conviction.

Norfolk Scope, a municipal arena, sells admission tickets to shows staged there and remits part of the proceeds to the promoters. Tickets are printed by a computer which, on request, publishes a "journal" or print-out of its transactions. Ordinarily, the promoter's fee is determined by the data recorded in the journal. Upon the promoter's request, however, the data may be verified by a "drop count" of tickets deposited at entrance gates by patrons.

Some tickets are printed and "prepulled" from the computer in advance of the show. Prepulled tickets may be sold as general-admission tickets at the time patrons arrive for the show or sold in advance as reserved tickets. The "sell journal" reflects all prepulled tickets as "sell" transactions. If some of such tickets are printed but not actually sold to patrons they are marked "void" and classified as "deadwood", and the computer is instructed to "unsell" them. These transactions are reflected in the "unsell journal." Normally, absent some error in prepulling or printing, an unsell transaction is not performed the same day the ticket is prepulled.

Following a wrestling event staged at Scope the night of September 13, 1979, the promoter demanded a drop count. The computer had published a complete print-out that afternoon, but the unsell journal, which had been detached from the foot of the sell journal, was missing. Upon request, the computer printed new journals. The net sales reflected there proved to be less than the number of tickets reported in the drop count.

The September 13 sell journal showed that 199 general-admission tickets had been prepulled at 12:45 p.m. The unsell journal for that day showed that these tickets were returned to the computer bank in unsell transactions 14 minutes later. Of the 199 tickets thus prepulled and unsold, 123 appeared in the drop count and 49 in the deadwood count; the remaining tickets were never found. The September 11 sell journal showed that 1500 general-admission tickets had been prepulled that day in preparation for the September 13 wrestling show.

As Scope's box office manager, defendant was authorized to prepull reserve and general-admission tickets and to operate the computer for unsell transactions. Questioned by a detective when

the drop count revealed the irregularity, defendant said that he had not prepulled any tickets on September 13. The detective testified that defendant told him that he "did not have a working knowledge on how to pull tickets" without "assistance from others". At trial, defendant acknowledged that he had prepulled some reserved tickets on September 13 but denied that he knew anything about the 199 general-admission tickets at issue.

At the time these tickets were prepulled and unsold, defendant and two Scope employees were the only people in the box office where the computer terminal was located. George Beck, a computer technician who entered at 12:40 p.m. and left 15 minutes later, testified that he saw defendant "punch in for tickets once." Leah Adams, box office assistant manager, testified that defendant entered the office at 12:40 p.m. as Joan Smith (unrelated to defendant), a part-time ticket seller, was leaving to relieve a regular ticket seller at her booth; that "as soon as Joan walked out [defendant] came in and started punching tickets"; that he took the tickets to his office; and that, during the period of time in question, no one else touched the computer.

Deadwood tickets usually were stored in Adams' desk to be counted before they were destroyed. Joan Smith testified that, while Adams was away from her desk on September 13, she found 49 general-admission tickets in Adams' desk. Noting that they had not been voided, she took them and gave them to Vivian Lovick, a ticket seller, to sell at her window. The two women withdrew from cash receipts enough money to cover the sale price of the tickets and divided it between them. Through some inadvertence on the part of Lovick, these tickets were never sold to patrons and appeared in the deadwood count as part of the 199 prepulled general-admission tickets. Both women were charged with embezzlement, and both were convicted on guilty pleas.

■ A person who takes personal property from the possession of another without the owner's consent and with intent to deprive him of possession permanently is guilty of common law larceny. *Hewitt* v. *Commonwealth*, 213 Va. 605, 606, 194 S.E.2d 893, 894 (1973). A person entrusted with possession of another's personalty who converts such property to his own use or benefit is guilty of the statutory offense of embezzlement. Code § 18.2-111.[1]

---

[1] § 18.2-111. **Embezzlement deemed larceny; indictment; statement from attorney for the Commonwealth.**—If any person wrongfully and fraudulently use, dispose of, conceal or embezzle any money, bill, note, check, order, draft, bond, receipt, bill of lading or any other

The *corpus delicti* is not in question. The comparison of the drop count with the computer journals proved that at least 123 tickets Scope entrusted to defendant's possession were misappropriated. Joan Smith and Vivian Lovick embezzled 49. We must decide whether the evidence heard by the trial judge was sufficient to support his finding that defendant converted part of Scope's property to his own use or benefit. That is a question of criminal agency.

Defendant conceded in oral argument that the evidence supports the conclusion that he prepulled and unsold 199 general-admission tickets and carried them to his office. Defendant argues, however, that "[T]here is absolutely no evidence that [he] had anything to do with the tickets after he took them to his office." But criminal agency, like the *corpus delicti,* can be established by circumstantial evidence if the reasonable inferences it raises are sufficient to exclude every reasonable hypothesis of innocence. *Payne* v. *Commonwealth,* 216 Va. 265, 217 S.E.2d 870 (1975); *Boykins* v. *Commonwealth,* 210 Va. 309, 170 S.E.2d 771 (1969). Defendant argues that, since Joan Smith and Vivian Lovick confessed their own guilt and did not expressly implicate him in a criminal venture, it is fair to infer that some unnamed person, acting in concert with them or independently, misappropriated some of the tickets. Hence, defendant insists that the Commonwealth failed to exclude a reasonable hypothesis of his innocence.

As we understand defendant's oral argument, he contends that, absent direct proof of criminal agency, an accused embezzler cannot be convicted if it appears others had access to the embezzled property and an opportunity to commit the crime. On brief, he cites *Webb* v. *Commonwealth,* 204 Va. 24, 129 S.E.2d 22 (1963), where we reversed a conviction of an accused embezzler.[2] While

personal property, tangible or intangible, which he shall have received for another or for his employer, principal or bailor, or by virtue of his office, trust, or employment, or which shall have been entrusted or delivered to him by another or by any court, corporation or company, he shall be deemed guilty of larceny thereof, may be indicted as for larceny, and proof of embezzlement under this section shall be sufficient to sustain the charge. On the trial of every indictment for larceny, however, the defendant, if he demands it, shall be entitled to a statement in writing from the attorney for the Commonwealth designating the statute he intends to rely upon to ask for conviction. Such statement shall be furnished to the defendant, or his attorney, no later than five days prior to the date fixed for trial on the indictment provided the demand is made more than five days prior to such date.

[2] Defendant cites two other cases which are wholly inapposite. In *Revell* v. *Commonwealth,* 215 Va. 708, 709, 213 S.E.2d 756, 757 (1975), the record was "devoid of proof

the evidence there showed that third parties working closely with the defendant bookkeeper had opportunity to commit the crime, our decision that the evidence was insufficient to support the conviction rested on broader grounds. First, evidence of the *corpus delicti* was ambivalent; it appeared that the alleged shortage in funds reflected in an audit may have been the result of "glaring weakness in the system of the internal control", *id.* at 35, 129 S.E.2d at 30, or bookkeeping "errors . . . carried forward" from a time before the defendant began keeping the books, *id.* at 29, 129 S.E.2d at 26. Second, the evidence of criminal agency was insufficient because it tended to show innocent mistake rather than criminal intent; the accused, a former secretary, had no formal education in bookkeeping, and "[t]here was positive evidence that she had been inefficient" in the performance of her duties. *Id.* at 35, 129 S.E.2d at 30.

Proof of criminal intent, although not controlling, is highly relevant to a determination of criminal agency. Here, defendant does not claim mistake, and the evidence belies it. In a single, sustained operation, defendant prepulled 199 general-admission tickets in the early afternoon preceding the night of the show. Fifteen hundred general-admission tickets had been prepulled two days before, and nothing in the record suggests that more were needed for sale at the windows. Fourteen minutes later, defendant unsold all the tickets he had prepulled and carried them to his office. Because, contrary to conventional deadwood practice, he unsold them without marking them void, they remained fully salable commodities. Yet, by this procedure, defendant brought the debit and credit data in the computer bank into ostensible balance. When the drop count was conducted, the original unsell journal was missing. When a new unsell journal was printed and the misappropriation was discovered, defendant told a detective he did not know how to prepull tickets without help and that he had not prepulled any tickets on September 13. At trial, he acknowledged that he had prepulled some reserved tickets without assistance, but he denied that he had had anything to do with the general-admission tickets in issue. But his testimony, impeached by his own prior inconsistent statements, was expressly contradicted by two eyewitnesses.

---

that . . . [the embezzled property] ever came into Revell's possession"; in *Foster v. Commonwealth,* 209 Va. 326, 329, 163 S.E.2d 601, 603 (1968), "the record [failed] to establish beyond a reasonable doubt that defendant ever had possession of the stolen property."

■ Viewing the evidence and the reasonable inferences it raises in the light most favorable to the Commonwealth, we believe the trial judge could have found that defendant prepulled tickets unneeded for legitimate sale; that he first instructed the computer to record misleading data; that he later detached the unsell journal from the sell journal so that the sales shown in the drop count would not be more than those reported in the sell journal; and that he contradicted the testimony of the detective and two eyewitnesses, none of whom had any motive to perjure themselves.

■ While proof that property entrusted to the possession of the accused has been misappropriated is not enough, standing alone, to prove that the accused was the embezzler, where, as here, there is additional evidence, sufficient to show that the accused acted with the requisite criminal intent and that his conduct was designed to conceal his criminal purpose, we will uphold a finding that the accused was the criminal agent. *See Challenor* v. *Commonwealth*, 209 Va. 789, 167 S.E.2d 116 (1969); *Stegall* v. *Commonwealth*, 208 Va. 719, 160 S.E.2d 566 (1968).

*Affirmed.*