UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:    Judges Petty, Beales and AtLee
Argued by teleconference


CHARLES NICHOLAS NORDAN, S/K/A
 CHARLES NICK NORDAN,

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0238-17-2                      JUDGE RICHARD Y. ATLEE, JR.
                                                    JULY 17, 2018
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF POWHATAN COUNTY
                          Paul W. Cella, Judge

              J. Brian Bailey (Law Office of J. Brian Bailey, PLC, on brief),
              for appellant.

              Christopher P. Schandevel, Assistant Attorney General (Mark R.
              Herring, Attorney General, on brief), for appellee.


        Following a bench trial, a judge of the Circuit Court of Powhatan County ("trial court")

found appellant Charles Nicholas Nordan guilty of five counts of felony embezzlement and one

count of felony money laundering.  It sentenced him to 120 years in prison with 90 years and 42

months suspended.  On appeal, Nordan argues the trial court erred in:

        1.  denying [his] motion to strike for fatal variance between the
            indictments . . . and the facts proven at trial[;]
        2.  denying [his] motion to strike for failure to prove that the funds
            were entrusted to [him;]
        3.  denying [his] motion to strike for failure to prove fraudulent
            intent[; and]
        4.  failing to dismiss the embezzlement charges pursuant to a
            claim of right defense.

For the following reasons, we affirm.

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I. BACKGROUND

"Applying familiar principles of appellate review, we will state the facts in the light most favorable to the Commonwealth, the prevailing party at trial." Williams v. Commonwealth, 278 Va. 190, 191, 677 S.E.2d 280, 281 (2009). In addition, because this memorandum opinion carries no precedential value and the parties are familiar with the record, we include only those facts necessary to the parties' understanding of this Court's reasoning and ruling.

A. *The Businesses and Shareholders' Agreement*

Nordan, under the guise of raising capital for businesses that would primarily invest in solar energy and train veterans to install solar panels, met with Clyde Childress as a potential partner and investor. Nordan told Childress the money would be used to "establish the businesses and make [them] profitable." Childress agreed to invest because he supported the businesses' goals, particularly helping veterans. He also stated he trusted Nordan because they shared military backgrounds. Childress was around 75 years old at the time. He did not perform any background check on Nordan, although if he had, one would have revealed that Nordan had filed for bankruptcy twice in the last fourteen years and had numerous outstanding monetary judgments against him.

Childress agreed to invest in five businesses: (1) Nationwide Capital Investment Services, Inc. ("Nationwide Capital"); (2) Virginia Renewable Energy Corp. ("Virginia Renewable"); (3) Global Logistics and Security, Inc. ("Global Logistics"); (4) Pocahontas Farms, Inc. ("Pocahontas Farms"); and (5) Full Spectrum Learning, Inc. ("Full Spectrum"). The businesses were set up so that the latter four companies were wholly-owned subsidiaries of Nationwide Capital.

Nordan also was a partner, along with his girlfriend, in a company called I3 Leasing. Childress expressly declined to invest in I3 Leasing, preferring to involve himself in the ventures

that would, ostensibly, benefit veterans. Relevant to this appeal, I3 Leasing owed a substantial amount of money to an investor, Larrie Dean (Nordan's girlfriend's stepfather).

Nordan told Childress that he had put $185,000 into these five businesses; Childress elected to do the same so they would be equal partners. They agreed to this arrangement in May 2015, although the terms were not reduced to writing and signed until July 10. Reflecting their oral agreement, that written contract ("Shareholders' Agreement") stated that Childress would pay $185,000 and acquire a 50% stake in Nationwide Capital and that Virginia Renewable, Global Logistics, Pocahontas Farms, and Full Spectrum were wholly-owned subsidiaries of Nationwide Capital. The attorney who drafted the Shareholders' Agreement initially included I3 Leasing as a fifth subsidiary, but, consistent with the understanding that Childress did not wish to participate in that business, it was crossed out (Nordan's initials appear in the margins of the contract next to that modification). The Shareholders' Agreement also reflected that Childress would loan the businesses $215,000. Finally, the Shareholders' Agreement stated that "[i]t is anticipated that each stockholder will be able to draw $10,000 per month from the Corporation in addition to the note repayment." The phrase "it is anticipated" is underlined by hand, consistent with their understanding that monthly draws could begin after the companies started making money.[1]

---

[1] This reflects Childress's testimony about when they would be able to begin drawing on corporate funds, which the trial court ultimately believed over Nordan's assertion that he believed he could make purchases for personal expenses from corporate accounts and it "would be taken out of his owner's equity in the corporation and would be accounted for in the accounting process." "[D]etermining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact." Parham v. Commonwealth, 64 Va. App. 560, 565, 770 S.E.2d 204, 207 (2015). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Flanagan v. Commonwealth, 58 Va. App. 681, 702, 714 S.E.2d 212, 222 (2011) (quoting Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998)).

## B. *Childress's Financial Contributions to the Partnership*

Although Nordan's and Childress's partnership agreement was not memorialized in writing until July 10, 2015, Childress began investing in and contributing to the shared businesses prior to that. Specifically, on June 1, 2015, Childress transferred $30,000 from his bank account — specifically, Childress's family trust — to the Virginia Renewable bank account. On June 18, he transferred another $20,000 to that same account. On June 20, he wrote a check for $135,000 with Nordan as the payee; Nordan deposited this into the Nationwide Capital account. Childress also paid $149,000 for a down payment on some property "on behalf of Pocahontas Farms." Finally, on July 7, he wrote a check for $37,500 for use as a deposit on purchasing a poultry farm for Virginia Renewable on which they intended to install solar panels. After signing the Shareholders' Agreement, Childress invested an additional $50,500 in the corporations (specifically into the Nationwide Capital and Virginia Renewable accounts). In total, Childress deposited $235,500 into the businesses' accounts.

## C. *Nordan's Expenditures*

A financial crimes investigator for the State Corporation Commission, Steven Cava, testified for the Commonwealth at trial. After examining the bank accounts affiliated with the businesses that Childress held an interest in, as well as those of I3 Leasing, he determined that prior to Childress's investments, the accounts had only $1,631.53. Despite Childress's contributing $235,500 into the accounts between June and August, all but $5,593.91 had been spent by the six companies by the end of August.[2] Cava traced the money over that three-month

---

[2] By the end of August 2015, Cava testified that a total of $312,787.54 was deposited; however, Childress was the only contributing partner. The remainder came from a smattering of other sources, such as a contract with a timber company paid to Pocahontas Farms, or payroll supplements from the state.

period, and identified a number of expenses and withdrawals from the businesses' accounts that did not appear to have a legitimate business purpose.

Using money Childress invested in the shared business venture, Nordan made numerous purchases, without consulting Childress, that did not relate to the businesses' operations. On June 24, 2015, Nordan used $5,000 from the Virginia Renewable account to purchase a new pickup truck. He titled it in his name, and the purchase document reflects that it was to be for personal use.[3] That same day, he paid $4,700 in cash from the Nationwide Capital account to purchase a Jaguar. On July 20, he used $12,000 from Pocahontas Farms to purchase a Harley-Davidson motorcycle. On July 24, he paid $1,228.64 to Baldwin Auto Services from the Global Logistics account, for services and repairs on a Honda Civic belonging to someone whom Nordan testified was "becoming an employee" in his business. Nordan also permitted his son to use a Full Spectrum company credit card on a personal trip to the Outer Banks.

On July 31, 2015, Nordan withdrew $35,000 from the I3 Leasing account to repay the loan from Larrie Dean to that business. In the days prior to that withdrawal, Nordan had made four $12,000 transfers into the I3 Leasing account from each of the Full Spectrum, Pocahontas Farms, Global Logistics, and Virginia Renewable accounts.[4] When asked[5] about these transfers,

---

[3] The trial court expressly rejected Nordan's claim that he declined to specify it was for business use in order to take advantage of a $500 discount offered to veterans.

[4] As the Commonwealth notes, the $48,000 in transferred assets exceeded the amount needed to cover Nordan's repayment of Dean's loan to I3. Nevertheless, it is evident that some of these funds — well over $200 from each transfer — was used in that repayment.

[5] The investigation that ultimately led to Nordan's charges and convictions began because Childress's son-in-law became suspicious about the businesses' activity after he questioned the logic of one of Nordan's ventures, and highlighted that the transaction would inevitably be a net loss. After Nordan responded angrily and evasively to his inquiry, Childress's son-in-law asked Childress to show him the businesses' bank records. After identifying certain dubious transactions, including transfers from the businesses Childress invested in into the I3 account, he and Childress reported their findings to law enforcement.

Nordan explained that these transfers were for lease payments, as Nordan had arranged for I3 Leasing to rent office space to the businesses in which Childress had invested. He produced four[6] "lease agreements" that each provided for a monthly rental payment of $4,000 from one of the businesses Childress invested in to I3. Childress testified that he "was willing" to rent this space, but not until the businesses were "operating" — meaning there should not have been payments during June, July, and August of 2015, because at the time, none of the businesses in which Childress had invested had any use for space in the building. Moreover, Childress had never seen these "lease agreements" before. Nordan signed the leases on behalf of each respective lessee, and Nordan's girlfriend signed on behalf of I3. Nordan alleged the leases were signed on May 1, 2015. At trial, a special agent for the state police testified that he had examined Nordan's computer and had determined that the "lease agreements" had been created September 19, 2015, and, in his opinion, Nordan had backdated them to May 1.

D. *Trial Court Rulings*

In finding Nordan guilty of embezzlement, the trial court recited the following transactions as misuse of corporate funds:

- the purchase of the truck;

- the use of money to pay personal expenses to Baldwin Automotive (which includes both the Jaguar purchase and the car repair); and

- the purchase of the Harley-Davidson motorcycle.

It found that the money funneled through I3 to pay back the loan to Dean constituted money laundering. The trial court rejected Nordan's claim that the transfers to I3 Leasing were legitimate rent payments, finding that Nordan had fabricated and backdated the purported lease agreements. It also rejected Nordan's claim that he was entitled to draw upon company funds for

---

[6] The record and trial testimony refer to five lease agreements; however, the Commonwealth only submitted four into evidence.

personal use pursuant to the Shareholders' Agreement, because the businesses had no active operations or income. In so ruling, the trial court implicitly credited Childress's testimony and rejected Nordan's regarding the terms of their oral agreement prior to signing the written Shareholders' Agreement.

## II. ANALYSIS

### A. *"Fatal Variance" in the Indictments*

Each of the five indictments, and five subsequent convictions, for embezzlement correspond to one of the five companies Nordan established in which he partnered with Childress, and name each business as the victim. Nordan argues that the evidence at trial "proved that the money spent was money that belonged to Clyde Childress," as opposed to the businesses, therefore there was a "fatal variance" between the indictments and the evidence presented at trial.

"A fatal variance occurs when the criminal pleadings charge one offense and the evidence proves another." Commonwealth v. Bass, 292 Va. 19, 27, 786 S.E.2d 165, 170 (2016). In other words, Nordan argues that to the extent he misappropriated funds, those belonged to Childress and not the businesses and that there was no indication Nordan "did not have the authority" to spend the money as he did.

Nordan's argument fails for several reasons. First, he claims in his second assignment of error that before he and Childress signed the Shareholders' Agreement, Childress was "nothing more than a corporate investor in the five companies," and "Nordan was the only owner/manager of the corporations with absolute discretion over the invested funds." These assertions are fundamentally inconsistent with his argument that Childress was the actual victim and thus the indictments contained fatal variances. "A party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or

mutually contradictory." Rowe v. Commonwealth, 277 Va. 495, 502, 675 S.E.2d 161, 164 (2009) (quoting Cangiano v. LSH Bldg. Co., 271 Va. 171, 181, 623 S.E.2d 889, 895 (2006)). Accordingly, Nordan cannot argue that the misused funds were still Childress's, but then claim that Nordan had absolute authority to use these investments however he pleased because they were corporate funds.

Furthermore, Nordan's argument fails on the merits. An embezzlement conviction requires that a person entrusted with possession of another's property converts such property to his own use or benefit. Smith v. Commonwealth, 222 Va. 646, 649, 283 S.E.2d 209, 210 (1981); Code § 18.2-111. In order to determine whether the allegedly embezzled property belonged to another, courts assess the "ownership of the funds at the time they were withheld." George v. Commonwealth, 276 Va. 767, 774, 667 S.E.2d 779, 783 (2008). Here, the evidence established that Nordan embezzled from each of the five businesses after money had been transferred into them by Childress and other sources. Specifically, Nordan embezzled the following amounts of money from the following businesses:

- $5,000 from Virginia Renewable to purchase a new pickup truck;

- $4,700 in cash from Nationwide Capital to purchase a Jaguar;

- $12,000 from Pocahontas Farms to purchase a Harley-Davidson motorcycle;

- $1,228.64 from Global Logistics for services and repairs on a Honda Civic; and

- $12,000 each from Global Logistics, Full Spectrum, Pocahontas Farms, and Nationwide Capital to I3 Leasing for a $35,000 payment on a prior loan to I3 Leasing.[7]

---

[7] The trial court also noted this transaction in convicting Nordan for money laundering, stating that he moved "money that was derived from felonies run through I3 with an intent to conceal."

The evidence at trial showed that Childress directly invested money into the businesses pursuant to an agreement to be equal partners. These investments were deposited either directly into one of the businesses' accounts or were specific investments into that business venture. Nordan used that money to make purchases (such as the truck, motorcycle, Jaguar, and car repairs) or payments (the loan payment on behalf of I3) that, as the trial court found, were unrelated to the businesses' contemplated purposes — to invest in solar energy and train veterans to install solar panels. In short, Nordan was charged with embezzling from five businesses, and the evidence shows that he did. He cites no contrary authority to support his interpretation that the misused funds still "belonged" to Childress.

Nordan's assertion that the trial court treated Childress, not the corporate entities named in the indictments, as the victim is also belied by the record. In convicting Nordan, the trial court stated:

> There's no question that Mr. Nordan used, disposed or concealed the money that was *entrusted to him by these companies*. Money from the various companies was funneled to I3 and then paid out to Mr. Dean for a note of I3, which was not any bona fide obligation of any of the *companies that are alleged to have been victims* in this case.

(Emphases added). As such, the trial court did not err in finding there was no fatal variance between the indictments and the evidence presented at trial.

B. *Entrusted Funds*

Nordan next argues that "[n]either the scenario prior to July 10, 2015 [n]or entry into the Shareholders['] Agreement created a relationship of agency or employment between Nordan and Childress." This assignment of error is comprised of two distinct arguments: (1) that Nordan had "absolute discretion" to use the invested funds as he saw fit prior to signing the Shareholders' Agreement, and (2) that once he and Childress signed the Shareholders'

Agreement, they were equal partners and thus owed each other no fiduciary duty. We disagree with both assertions.

As to the first argument regarding the funds misused prior to the signing of the Shareholders' Agreement, Childress plainly did not entrust Nordan with discretion to use these funds however he pleased, certainly not for his personal benefit. These were investments in the businesses, and Nordan was a partner in those businesses who had a duty to use those funds for corporate purposes. It is irrelevant that some of the transactions took place prior to the actual signing of the Shareholders' Agreement, because, as Nordan largely concedes,[8] that written contract memorialized the agreement between Nordan and Childress that predated Childress's investments into the businesses.

Nordan's argument that the trial court erred in finding embezzlement where Nordan misused assets after signing the agreement also fails. Nordan argues that he and Childress became "co-directors of the corporations by virtue of the Shareholders Agreement" and that they thus did not have any "duties" to each other. "In order to prove embezzlement, however, the existence of a formal fiduciary relationship is not necessary. Rather, the Commonwealth must prove that the defendant was *entrusted* with the property of another." Chiang v. Commonwealth, 6 Va. App. 13, 17, 365 S.E.2d 778, 780 (1988). As with the funds Nordan embezzled before signing the Shareholders' Agreement, the funds he embezzled after that date were the property of the five corporate entities in which Childress had invested. Nordan's argument regarding the duties owed or agency relationship between Nordan and Childress is a red herring. The invested funds were the property of the businesses, and Nordan committed embezzlement when he

---

[8] The exception is Nordan's "feeling" that he could make purchases for personal expenses from corporate accounts and it "would be taken out of his owner's equity in the corporation and would be accounted for in the accounting process," a claim which, as explained above, the trial court rejected.

"convert[ed] such property to his own use or benefit." Smith, 222 Va. at 649, 283 S.E.2d at 210. As such, the trial court did not err in finding that Nordan, by virtue of his position in the businesses, and his use of the corporate funds on expenses unrelated to the operation of those businesses, was guilty of embezzlement.

### C. *Fraudulent Intent and Claim of Right Defense*

Nordan's final two assignments of error both relate to whether the Commonwealth proved he possessed the requisite *mens rea* to support his convictions. He argues that the Commonwealth failed to prove he acted with fraudulent intent because he had a legitimate claim of right to use the funds.

The claim of right defense asserts that a defendant did not have the necessary intent to steal, and "requires a predicate showing of 'good faith,' a *bona fide* belief by the taking party that she has some legal right to the property taken." Groves v. Commonwealth, 50 Va. App. 57, 63, 646 S.E.2d 28, 31 (2007) (quoting Butts v. Commonwealth, 145 Va. 800, 811-12, 133 S.E. 764, 767-68 (1926)). This belief, although mistaken, must be genuine. Id. Whether a defendant's assertion of a claim of right is sincere or a "mere pretext" is a matter for the fact-finder, here, the trial court. Id. (quoting Pierce v. Commonwealth, 205 Va. 528, 533, 138 S.E.2d 28, 32 (1964)). To the extent this question involves evaluating whether the defendant is being truthful in his testimony, "determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact," Parham v. Commonwealth, 64 Va. App. 560, 565, 770 S.E.2d 204, 207 (2015), and we will accept its determination unless, as matter of law, it is inherently incredible, Nobrega v. Commonwealth, 271 Va. 508, 518, 628 S.E.2d 922, 927 (2006). We must affirm the verdict unless the fact-finder was plainly wrong or its judgment unsupported by the evidence. Ervin v. Commonwealth, 57 Va. App. 495, 503, 704 S.E.2d 135, 139 (2011).

Nordan argued before the trial court, and asserts now on appeal, that his actions reflected only "ignorance and poor business acumen," as opposed to the intent to use funds Childress invested in their shared venture for purchases and payments unrelated to their shared businesses. The trial court rejected this argument, stating:

> The next question then is the fraudulent intent and whether there was some legitimate claim of right. As the Commonwealth has noted, money was moved around from different accounts and funneled through I3 to pay Dean. The motorcycle was paid for with a cashier's check. The Jaguar was bought with cash. There's evidence of fraudulent intent here, I think with the obviously false statements made in the ODEC [(Old Dominion Electric Company)] proposal,[9] and in that letter of credit that said that a million dollars was available, when, in fact, it was not. The manipulation and fabrication of the leases, I think indicates fraud.
>
> . . . .
>
> The argument of claim of right is something that I don't believe. I find it implausible that somebody could believe that they could take money that was invested in a company, and the company was just getting started up, and you are using it to go buy a truck [and title it in your name for personal use], a motorcycle, pay off some debt to somebody else, and you have got the supposed lease of a building that can't be occupied; that doesn't add up to the claim of right.

We see no error in the trial court's interpretation of the facts or its reasoning, and agree that there was sufficient evidence Nordan acted with fraudulent intent, as he had no reason to believe he had a legitimate claim of right to use the funds as he did.

### III. CONCLUSION

The trial court did not err in finding Nordan guilty of embezzlement and money laundering. Thus, we affirm his convictions.

Affirmed.

---

[9] Evidence at trial included information Nordan submitted in a proposal to ODEC, which was described as "an organization of electric companies . . . [which] is primarily the gateway to selling the power made by a solar farm or a large solar array" to a utility company when the solar arrays produce more power than needed by the property.

Petty, J., concurring.

I agree that the trial court did not err in convicting Charles Nicholas Nordan for the crimes with which he was indicted. However, because I would affirm the convictions on narrower grounds than the majority, I write separately. See Commonwealth v. White, 293 Va. 411, 419, 799 S.E.2d 494, 498 (2017) (recognizing that we decide cases "on the best and narrowest grounds available").

Nordan was indicted for embezzlement from Nationwide Capital Investment and its wholly owned subsidiaries: Virginia Renewable Energy Corporation, Pocahontas Farms, Inc., Full Spectrum Learning, Inc., and Global Logistics and Security, Inc. (the companies). Nordan was a principal of each of the companies. Because it is clear to me that Nordan committed an embezzlement from each of the companies when he fraudulently transferred money from each to a separate company that he controlled, I find it unnecessary to consider the other expenditures discussed by the majority.

Code § 18.2-111 provides,

> If any person wrongfully and fraudulently use, dispose of, conceal
> or embezzle any money . . . or any other personal property . . .
> which he shall have received for another or . . . for his principal . . .
> by virtue of his office, trust, or employment, or which shall have
> been entrusted or delivered to him by . . . any . . . company, he
> shall be guilty of embezzlement.

Wells v. Commonwealth, 60 Va. App. 111, 118, 724 S.E.2d 225, 229 (2012). "Proof of the '[u]nauthorized and wrongful exercise of dominion and control over another's personal property, to [the] exclusion of or inconsistent with [the] rights of the owner,' is sufficient to prove embezzlement." Id. (alterations in original) (quoting Evans & Smith v. Commonwealth, 226 Va. 292, 297, 308 S.E.2d 126, 129 (1983)).

Here, the evidence taken in a light most favorable to the Commonwealth, demonstrated that Nordan fabricated fictitious lease agreements between each of the companies and I3

- 13 -

Leasing, LLC, which owned the building where the subsidiaries were housed. Nordan was also a principal of I3 Leasing. The Commonwealth's forensic accounting expert explained that Nationwide Capital Investments transferred $12,000 to Full Spectrum on July 29, 2015, which was transferred to I3 Leasing two days later. Nationwide Capital Investments additionally transferred $12,000 to I3 Leasing directly. Virginia Renewable Energy transferred $12,000 to Global Logistics & Security on July 29, 2015, which then transferred the money to I3 Leasing two days later. Pocahontas Farms additionally transferred $12,000 to I3 Leasing on July 31, 2015. The purported reason for the transfer of these funds was lease payments for three months at the rate of $4,000 per month. In each case, the funds were the property of the company from which they were transferred.

The trial court found the lease arrangement to be fraudulent. The trial court further found the leases did not exist when the $12,000 payments were made to I3 Leasing. The trial court deemed credible the evidence that the lease agreements "were fabricated in September or October and then backdated [to May]." The trial court found the leases to be fraudulent after noting that "none of these corporate entities that are victims here were really doing any business. So there's no legitimate reason for them to be leasing space in a building that doesn't have a [certificate of occupancy] to start with."

Nordan caused the transfers, which exceeded two hundred dollars, from each of the companies listed in the indictments. The transfers were from these companies to I3 Leasing, a separate company over which he had control. The evidence further established that Nordan used this money to repay a loan for which he and I3 Leasing were obligated. In view of the fraudulent nature of the leases, and the use of the embezzled money for a purpose unrelated to any of the companies from which the money was obtained, the evidence showed Nordan wrongfully and

- 14 -

fraudulently transferred money entrusted to him as the principal of the companies named in the indictments.

Accordingly, Nordan's assignments of error are easily dispatched. Nordan was clearly in a fiduciary relationship with the companies from which he embezzled, and his argument that the Commonwealth failed to show "a relationship of agency or employment between Nordan and Childress" is irrelevant. Although the Commonwealth interwove evidence regarding Clyde Childress into its case, the evidence showed that it was money belonging to the companies listed in the indictments that Nordan wrongfully transferred to I3 Leasing. Thus, there was no fatal variance between the indictments and the evidence presented. The creation of fraudulent leases established Nordan's fraudulent intent in making the transfers.

And, finally, Nordan's claim of right defense fails because of his fraudulent intent. "One who converts the property of another which is in his lawful possession is not guilty of embezzlement (for his conversion is not fraudulent) if, when he converts, he otherwise honestly believes he is authorized to convert it." 3 Wayne R. LaFave, Substantive Criminal Law, Embezzlement, Claim of Right § 19.6(f)(1) (2018). I find it unnecessary to consider Nordan's claim of a legitimate business purpose for the use of the company's money to purchase vehicles and other expenditures as discussed by the majority; the evidence was unquestionably sufficient for the trial court to find that he that he was *not* authorized by the companies to transfer large sums to pay fraudulent lease agreements. Because he could not have honestly believed the leases were legitimate, his claim of right defense fails.

Thus, I would affirm but on the narrow grounds that the fraudulent payments exceeding two hundred dollars from the named companies to I3 Leasing for purported lease payments was sufficient to convict Nordan of the crimes for which he was indicted.