# Richmond

DOUGLAS D. HUBBARD v. COMMONWEALTH OF VIRGINIA.

May 1, 1950.

Record No. 3677.

Present, All the Justices.

The opinion states the case.

*Conway H. Sheild, Jr.* and *Owen S. Livsie,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *H. T. Williams, Jr., Special Assistant,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

This case is here upon a writ of error to a judgment of the Circuit Court of York county, entered on June 1, 1949, wherein the defendant, Douglas D. Hubbard, was sentenced to five years in the penitentiary, pursuant to a verdict of the jury finding him guilty of murder in the second degree.

On Saturday afternoon, January 15, 1949, James W. Montague, while hunting in York county, Virginia, was shot by the defendant, Douglas D. Hubbard, and died shortly after his removal to a hospital. Hubbard admitted the homicide; but claimed, upon his trial, that he acted in self-defense.

James W. Montague, a welder by trade, was 44 years old at the time of his death, and resided in Warwick county, a county adjoining York. He kept a number of dogs, was fond of hunting, and engaged in that diversion nearly every day during the hunting season.

On the morning of January 15, 1949, Montague, with three friends, L. J. Gregory, R. C. Marshall, Jr., and G. C. Wood, drove by automobile from Warwick county to York county to hunt rabbits. They carried three hounds

belonging to Montague, parked their car near a tavern called the Tiptoe Grill, and hunted for some time in that vicinity. After an hour or more of hunting, two of the dogs became lost. Marshall and Wood went looking for the dogs, while Gregory and Montague stayed at the inn. Not being able to find the dogs, Marshall and Wood returned to the inn, where the party had lunch. Montague drank two bottles of 3.2 beer during the time he remained at the inn. One of the lost dogs returned after lunch, and the group decided to continue the hunt with the hope that the lost dog would hear the other dogs running and return. The group of four was joined by a colored man named Eppes, and all started hunting in the field near the inn. A rabbit was soon located and the dogs ran across the road and into a small body of woods. They soon lost the trail and stopped barking. Montague's party separated and started looking for the dogs. In a few minutes a shot was heard, followed in two or three seconds by two shots fired closely together. Wood, who had been out of the sight of Montague for three minutes, said "I heard a single shot, then a matter of a few seconds I heard a double shot simultaneously and I could hardly distinguish between the two, the last two, so I then, in turn, turned around and ran back through the woods." After running 35 to 40 yards, he found Montague lying wounded on the ground on the property of Lincoln Orange, 30 or 40 feet from the land of Douglas D. Hubbard. Two dogs were beside Montague, leashed by his belt to his right hand. Montague's 12 gauge double barrelled shotgun, with two empty shells in it, was lying under him. He was conscious when found, but spoke only the words: "Leave me alone," or "Don't bother me," before his death. Montague was taken to the hospital in Williamsburg by his companions, where he died within ten or fifteen minutes.

Marshall testified that he heard "one shot and an interval from 2 to 5 seconds, I'd say, and then there was two shots which seemed almost simultaneously. Just right together." Hearing his name called, he proceeded to the place where

Montague was found. He corroborated Wood as to the details surrounding the finding of Montague and the general surroundings.

At the inquest on the body of Montague it was found that he had received nine buckshot wounds, "one in front of left knee, one in left side,—inside, about 6 inches above the knee; one in right side,—inside, midway between knee and hip; one right side, lower margin of ribs; one directly over the heart and one half-way between the heart wound and the shoulder on the left side; one in the midpoint of the neck, lower part; one in the middle of the neck on the right side; one in the left arm just above the elbow."

Philip Montague, son of the deceased, testified that his father was an experienced hunter and always fired his gun from his left shoulder. He viewed the body of his father and discovered a bruise on the finger which was not there the night before his death. His father's dogs, on his last hunting trip, were small, one an adult two feet tall, and the "other just beginning to run," about eighteen inches high.

V. W. Lovelace, sheriff of the city of Williamsburg and county of James city, received a call about two o'clock of the same day to come to Bell's Hospital because some one had been shot. He promptly responded and went to the emergency room of the hospital, where he found the defendant with a nurse, Mrs. Hubbard, and the Honorable Frank Armistead, Judge of the Fourteenth Circuit, which included the city of Williamsburg and county of York. Upon his arrival, Hubbard asked him, "What the hell I was doing there?" Judge Armistead then requested the sheriff to swear out a warrant for Hubbard which the sheriff immediately did, charging the defendant with the murder of Montague. Lovelace said someone asked Hubbard about the man who was shot, and Hubbard replied that "he would like to see them pick the shot out of the other man."

There was considerable evidence regarding terrain, fences, lines of fire, and pattern of shot. No scaled map was introduced.

H. D. Riley, deputy sheriff of York county, testified that he went to the hospital, viewed the body of Montague, and then went to a room where Hubbard was lying in bed. He asked Hubbard if he felt like talking about the shooting. Hubbard replied, "If you want to know anything about it, find my attorney Robert Armistead, and if you do find him, tell him I would like to see him myself because I haven't seen him as yet." Riley, at Hubbard's request, read aloud the warrant charging the latter with the murder of Montague.

Riley thereafter went to the scene of the homicide. He found there a 12 gauge empty shell lying on the Hubbard property beside a poplar tree about 82 feet from a fence. He also found blood on some leaves beside a fence on the Lincoln Orange property approximately 30 steps, or 90 feet, from the tree where the empty shell was found. There was also evidence of the passage of buckshot and fine shot, No. 6 or No. 8, on the trees and bushes. The lines of fire of the buckshot and fine shot were parallel and travelled through the same point. The land where the empty shell was found was about nine feet and two inches higher than that where Montague had been found wounded. In an examination of the pockets of the coat of Montague, Riley found some shells containing No. 6 and No. 8 small shot.

Dr. B. I. Bell, who treated Hubbard, found 75 or 80 gunshot wounds on the person of the latter. They were made by small shot and entered his body from his forehead to below his knee, with "a good many in the right arm and right side of the body and abdomen. There were 16 in the right leg from the hip down to the knee."

Dr. H. G. Stokes viewed the body of Montague on the afternoon of the shooting. He did not probe or follow the course of the shots in the body. He said he did not know, but that he thought the wound directly over the heart caused death. He expressed the opinion that Montague could not have aimed and fired two shots after he had been struck as described. He said his opinion, in that

respect, would not be "influenced" even though it be assumed that Montague after he was shot turned around and crossed a fence approximately 20 inches high and walked a distance of approximately 30 yards.

Dr. Stokes also gave medical treatment to Hubbard at four-thirty that afternoon. He thought that the shot found in the latter's body possibly formed two patterns or groups of shots. He said that Hubbard, who was then conscious and seemed to know what he was talking about, told him that Montague was on the Lincoln Orange land, and not the Hubbard land, when he was shot.

Edward K. Pettitt, a merchant, testified that between Christmas day, 1948, and New Year's day, 1949, Hubbard came to his store and purchased "six 12-gauge gun bore No. 4 buckshot shells" of the same make and color as the empty shell found on the Hubbard property and the loaded shell in Hubbard's gun.

Over the objection of the defendant, the Commonwealth's attorney was permitted to ask the above witness whether Hubbard made any comment with reference to the use of the shells. The witness said that Hubbard replied, "If they didn't do the work, he would cut up some nails and put it in the shells."

R. M. Goode, a York county police officer, saw the empty 12-gauge shell found on the Hubbard property near a poplar tree. He then went to the Hubbard home and there found the single-barrelled shotgun, with which the killing was done, loaded with a similar 12-gauge No. 4 buckshot shell. He counted the number of shot in a like shell and found that it contained 27 buckshot. He also examined a 12-gauge shell of No. 8 shot, of the same make that was found empty in the Montague gun, and found 450 small shot.

Dr. J. M. Henderson, coroner of the city of Williamsburg, who saw Montague immediately after he was brought to the hospital and who conducted the inquest on the latter's body, was unable to say which particular shot or shots

caused his death. There was no evidence of an external hemorrhage.

H. D. Riley said that, upon his examination of the body of Montague, he found a fresh bruise between the first two fingers on the left hand of Montague. There were no marks or scratches of bullets on Montague's gun.

R. C. Marshall, Jr., identified the spot where Montague was lying as being ten or fifteen feet out of the line of fire described by other witnesses.

Hubbard is a farmer, married, about 58 years of age, and has lived practically all of his life on a farm which he owns in York county, about half a mile from the city of Williamsburg. He said that he first met Montague hunting on his property without permission about the first of the hunting season in November, 1948. They then and there had an argument which resulted in Hubbard obtaining a warrant against Montague for trespass. Montague, in turn, obtained a warrant charging Hubbard with threats to kill him and to shoot his dogs. The warrants were disposed of before the trial justice of York county on some date between December 25, 1948, and January 1, 1949. The record does not show the outcome of the trials.

Between December 25, 1948, and New Year's day following, and before the warrants were disposed of, the defendant bought the six buckshot shells from Pettitt, hereinbefore mentioned. Hubbard admitted that one of these shells was used in shooting Montague. There was no evidence that the defendant and the deceased saw each other between the date of the disposal of the warrants and the date of the shooting. It was disclosed that the deer hunting season ended on January 5, 1949, and the general hunting season on January 20, 1949.

The defendant gave the following version of the shooting:

He said that on January 15, 1949, about one o'clock in the afternoon he took his single-barrelled 12-gauge shotgun and a ten months old fox terrier puppy and went into the

woods on his farm to train the dog in hunting squirrels; that about 300 yards from his home he stopped to let his dog hunt; that he heard someone calling dogs, and shortly thereafter two dogs jumped a fence and came on his property; that he picked up his puppy and held her on his left arm to keep her from following the other dogs; that a man, whom he did not at first recognize as Montague, followed the two dogs over a low place in the fence four or five steps on to the property of the defendant, about 25 or 30 yards from where the defendant was standing; that thereupon Montague stopped, looked around, called his dogs, bent over as though putting a leash on them, and then quickly straightened up and said, "I told that Judge at Yorktown the other day I was going to kill you, and damn you, I am going to kill you.* Damn you! Drop that gun!"; that he continued to hold his puppy on his left arm and his gun in his right-hand; that Montague repeated his threat to kill and his order to drop the gun, and then shot him in the stomach and legs; that he twisted around to his left to drop the puppy behind him, and while so twisting Montague said "God damn you! Drop it!" and shot again, the shots taking effect in his right side, arm and over the right eye; that three shots struck the puppy and some struck his gun; that thereupon he "straightened around" and returned Montague's fire; that Montague turned and walked four or five steps to the low fence and proceeded across to the Lincoln Orange property; that after firing he immediately reloaded his gun and watched Montague continue to walk slowly away, saying something like "Oh, Bob;" and that, seeing no other person, he then left the scene, hurried to his home, and told his wife Montague had shot him.

Defendant further testified the buckshot shell which he fired at Montague had been in his gun since the deer hunting season; that he had gone on his squirrel hunting trip without knowing it was still in his gun; that he carried in

---

*Hubbard said that he had not heard Montague make such a declaration to the Judge, and no one testified that Montague did make such a threat.

the pockets of his coat other buckshot shells which had been put therein for a former hunting trip; and that he also had with him some shells with smaller shot used for hunting squirrels. He denied that he had told Dr. Stokes on the afternoon of the shooting that Montague was on the Lincoln Orange land when shot.

The defendant testified that after he told his wife he had been shot, he proceeded to Williamsburg for the purpose of going to a hospital; that on his way he went to the home of Judge Frank Armistead, trying to locate the latter's son, Mr. Robert T. Armistead, his counsel; and that Mrs. Hubbard talked to Judge Armistead possibly two minutes, and when she returned he went directly to the hospital.

On cross-examination, the defendant was asked why he had not related his version of the shooting to Officer Riley, whom he knew was investigating the case. His answer was, "For several reasons. Mr. Riley came in there and he didn't warn me that anything I might say might be used against me, but Judge Armistead had told me to keep my mouth shut."

The trial judge found it necessary to warn the defendant twice about his attitude in answering questions. On the second occasion, in answer to a question from counsel for the Commonwealth, whether the shots quickly occurred, the defendant replied: "There wasn't time then for any damn foolishness."

Mrs. Hubbard said that her husband went hunting with the puppy on the afternoon of the shooting; that he was gone about 15 or 20 minutes; that when he returned home he told her Montague had shot him; and that while he was away from home, she had heard the sound of three gunshots, evenly spaced.

The jury was fully and fairly instructed, eleven instructions being given for the Commonwealth and eleven for the defendant, covering every aspect of the case.

There are no assignments of error relative to the instructions.

After the instructions had been given to the jury and counsel had concluded their arguments, counsel for the defendant, in referring to a portion of the argument of counsel for the Commonwealth, said to the court: "I do not think that was proper argument, and I do not ask the court to tell the jury that, because I believe that would, perhaps, emphasize it in their minds; but I do move for a mistrial." The motion was overruled. The argument objected to was as follows:

"Let us go on to another circumstance. He goes home and what does he tell his wife? Montague shot me. Does he tell his wife he shot Montague? No, sir. From this evidence, and they tell us, she went away to Williamsburg knowing nothing about it except that he was shot. When he left home, gentlemen of the jury—now, bless your souls, here is a man of good judgment, you saw his ability to preserve and protect himself on the witness stand, you saw him here exhibit his ability—now he was in the position of a very good citizen who had been terribly mistreated and a man who upheld the law, a man who was shot at an unprovoked attack. He knew he had shot a man and he had walked away seriously injured, and what does he do? Does he call the Sheriff of the county and report it and surrender his gun and say I'm sorry, or would you come out here? 'I don't know whether the man is hurt bad or not, or dead. I had to shoot him.' Why no. He doesn't do that. He runs up to see a friend—not to the hospital but to see a friend. He tells his friend—happens to be Honorable Frank Armistead, judge of this Circuit. He doesn't tell us what he told Judge Armistead but what his friend told him to do, and what was it? 'Keep your mouth shut.' Now, gentlemen of the jury, do you suppose Judge Armistead would have told him that if he had told Judge Armistead that he was severely attacked and that he had to shoot a man in self-defense and he was so wrought up about it? We don't know what he told Judge Armistead but he tells you Judge Armistead told him to keep his mouth shut. If he had

told the Judge, with his ability as a lawyer wouldn't he have said, 'You don't have to give evidence against yourself—surely you have a right to keep your mouth shut—but if you are innocent to come to the authorities to protect you and not to harm you, and to apprise them of the outrageous thing that has happened to you.' "

It is contended that the trial court erred in permitting E. K. Pettitt to testify as to the defendant's statement about the buckshot shells; in refusing to permit a witness to testify as to a specific act of Montague; in denying the motion for a mistrial because of remarks of counsel for the Commonwealth during his argument to the jury; and in refusing to set aside the verdict as contrary to the law and the evidence and without evidence to support it. It is claimed that the evidence of the defendant showed, without contradiction, that he acted in self-defense.

 The statement of the defendant to Pettitt was obviously a threat to kill. It was made while grievances between the defendant and the accused were unsettled. The words indicated that the buckshot shells were purchased for some purpose other than that of merely shooting animals. Defendant offers no reasonable excuse for their purchase. He was an experienced hunter and knew that buckshot would kill deer.

In criminal cases, when the motive or intent of the accused is material, a wider range of evidence is permitted in showing such intent than is allowed in other cases. *Parsons* v. *Commonwealth*, 138 Va. 764, 775, 121 S. E. 68.

"As a general rule, general threats to kill, not shown to have any reference to deceased, are not admissible in evidence, but a threat to kill or injure someone not definitely designated is admissible where other facts adduced give individuality to it." 40 C. J. S., Homicide, section 206 (c). *Hardy's Case*, 110 Va. 910, 919, 67 S. E. 522.

In homicide cases, evidence of the words, actions, conduct, and general demeanor of the defendant before the killing, not too remote in time, may be introduced for the

purpose of proving his malice or motive. Motive is an inferential fact, and may be inferred, not alone from attendant circumstances, but, in conjunction with these, from all previous circumstances which have reference to, and are connected with the commission of the offense. Circumstances which tend to shed light on the motive or intent of the defendant, or tend fairly to explain his actions are admissible. Considered in connection with all the circumstances here, the jury had a right to consider whether the statement tended to show an existing disposition or design on the part of Hubbard to commit the offense charged against him.

Elmer Vaughan and W. D. Ball, called to testify on behalf of the defendant, said that the deceased had the general reputation of being quarrelsome when he was drinking. In rebuttal, four other witnesses testified that they had known Montague for many years; that he had the general reputation of being a good, quiet, peaceful and law-abiding citizen; and that they had never heard of him being involved in a quarrel.

On cross-examination, Vaughan said that he had had some trouble with Montague about one of the latter's dogs in the summer of 1947, almost two years before the trial. The court refused to permit Vaughan to relate that he then told Montague unless the latter took his dogs off the property of the witness he would kill them, and Montague replied he "would shoot me before I got home."

There was no evidence that Montague was intoxicated to any degree on the afternoon of January 15, 1949, as a result of drinking two bottles of 3.2 beer. On the other hand, his companions said he was entirely sober.

■ Under his plea of self-defense, the defendant had the right to present evidence that the general reputation of the deceased was that of a turbulent person. That right was granted. The only evidence tending to support his claim of self-defense was that of the defendant himself. Under the conditions he related, his right to shoot Montague was

not in question. If his version of the killing was true, his defense was complete. ·

Hubbard did not claim that he knew Montague had been drinking on the day in question and that he had the reputation of being quarrelsome when he was drinking. He did not assert knowledge of the circumstances of the incident to which Vaughan referred. His defense was that he shot Montague because the latter had shot him twice. The offered evidence of the details of the incident referred to by Vaughan was, in the absence of supporting evidence of self-defense and in point of the time of the alleged incident, too remote to be material under the circumstances here. However, the testimony of Vaughan that there had been trouble between him and Montague over a dog many months previously was before the jury for what it was worth. *Randolph* v. *Commonwealth, ante,* pp. 256, 264, 56 S. E. (2d) 226.

We have had frequent occasion to discuss the question of improper remarks of counsel. *Trout* v. *Commonwealth,* 167 Va. 511, 522, 188 S. E. 219.

█ The granting or refusal of a new trial on such grounds is a matter within the sound discretion of the trial court, and such discretion will not be interfered with except when abused.

The situation here differs from that in the ordinary case, in that the defendant specifically refrained from asking the court to tell the jury to disregard the objectionable remarks of the prosecuting attorney.

█ Jurors are supposed to be competent to understand and willing to obey the instructions of the court as to what they shall and shall not consider in determining their verdict. If a party desires to take advantage of his objection on account of improper remarks made by counsel in his address to the jury, the court should be promptly requested to instruct the jury to disregard them. *Spencer* v. *Commonwealth,* 143 Va. 531, 129 S. E. 351; Vol. 1, Digest of Va. & W. Va. Reports (Michie), Argument and Con-

duct of Counsel, section 26 *et seq.* He is not entitled to gamble on the jury's verdict. The effect, under the circumstances here, was to waive the objection.

Moreover, the remarks of counsel complained of were not exaggerated. The prosecuting attorney had a right to refer to the conduct and actions of the defendant, and to draw reasonable inferences therefrom. The inferences made were plausible, and might well have been drawn by the jury without the aid of counsel. The argument simply discussed what would have been the attitude of a man, entitled to claim self-defense on a charge of murder. The defendant had an opportunity to relate what he said to Judge Armistead and what caused the reply of the judge. It is significant that he did not call the judge as a witness. The advice of the judge, in whose jurisdiction the homicide occurred, was quite natural in any event.

This brings us to the principal assignment of error, that is, the sufficiency of the evidence. We cannot agree that the account given by the accused of the shooting is without conflict, and not inconsistent with any evidence as to the material facts in the case.

The law in Virginia, as the court properly instructed the jury, is that "every homicide is presumed to be murder in the second degree and the burden of proving the elements necessary to elevate the crime to murder in the first degree is upon the Commonwealth but on the other hand, in order to reduce the offense from murder in the second degree to manslaughter or excusable or justifiable homicide, the burden of the evidence is upon the accused."

See cases cited in notes to Virginia Code, 1950, section 18-30; Virginia Code, 1942 (Michie), section 4393.

The effect of the verdict in this case was that the Commonwealth had failed to establish that the killing was murder in the first degree, and that the defendant had failed to introduce evidence sufficient to warrant a finding that the killing was in self-defense.

There were numerous circumstances in the case entirely proper for the consideration of the jury which may have influenced it in attaching small weight to defendant's version of the killing. Bad feeling existed between the defendant and the deceased. While criminal warrants sworn out by each against the other were pending for trial, the defendant evidenced a state of mind bent on mischief. His location of the place where Montague was shot and his version of the time and sequence of the shots fired were contradicted. His conduct, his actions, and statements immediately after the shooting were not those of a man who acted in self-defense. He did not explain how he killed Montague until he went on trial. His statements subsequent to the killing manifested ill feeling towards the deceased. His attitude and demeanor on the witness stand showed a lack of feeling and indifference indicating his mental attitude.

In *Randolph* v. *Commonwealth, supra,* at page 263, we said:

"The jury were not required to accept the defendant's statement as to how the killing occurred simply because the defendant said it happened that way and no witnesses testified to the contrary. If from the improbability of his story and his manner of relating it, or from its contradictions within itself, or by the attending facts and circumstances, the jury are convinced that he is not speaking the truth, they may reject his testimony, even though his reputation for truth is not attacked and he is not contradicted by other witnesses."

Faced with the burden of reducing the offense from murder in the second degree to a lesser offense or justifiable homicide, the defendant's evidence, conduct, actions, and statements were such as to warrant the jury in finding that he had failed to rebut successfully the legal presumption against him.

Jurors are not given to dealing lightly with the life and liberty of a man. They and the trial judge are in a much

better position than we are to estimate the value of the testimony of all the witnesses.

It is not entirely easy to understand the testimony of the defendant as to the circumstances of the killing. His testimony as to why he carried a gun loaded with buckshot to hunt squirrels is not satisfactory. He assigns no good reason why he did not immediately claim he killed the deceased in defense of himself. The learned and able judge who presided at the trial of the case and who, like the jury, observed and heard the witnesses, saw no reason to disturb the verdict. We cannot say that their conclusion was contrary to the evidence and without evidence to support it.

For the reasons stated, the judgment of the trial court must be affirmed.

*Affirmed.*