DUNG QUANG CHENG, A/K/A JOHN CHENG

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 891096 and 891098

June 8, 1990

Present: All the Justices

28

Leon S. Demsky; Peter M. Baskin for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Mary Sue Terry, Attorney General; Virginia B. Theisen, Assistant Attorney General, on brief), for appellee.

JUSTICE STEPHENSON delivered the opinion of the Court.

# I

## Proceedings

In separate indictments, Dung Quang Cheng, a/k/a John Cheng, was charged with the capital murder of Hsiang Liu,[1] Code § 18.2-31(a)[2] and -31(d);[3] with the abduction of Liu; with the robbery of Liu; with conspiracy to commit abduction, robbery, or murder; with the use of a firearm in the commission of robbery, abduction, or murder; and with the possession of a "sawed-off" shotgun. All indictments were tried together by the same jury.

At the conclusion of all evidence, the trial court struck the evidence on the shotgun possession charge. The jury, however, convicted Cheng of the remaining charges, fixing his punishment at life imprisonment for abduction, at life imprisonment for robbery, at 10 years' imprisonment for conspiracy, and at two years' imprisonment for use of a firearm. Following a separate hearing on the issue of punishment for capital murder, the jury fixed Cheng's punishment at death. On July 27, 1989, after receiving a post-sentence report, the trial court imposed the sentences fixed by the jury and entered judgments thereon.

We have consolidated the automatic review of Cheng's death sentence with his appeal of the capital murder conviction, Code §§ 17-110.1(A) and (F), and have given them priority on the docket, Code § 17-110.2. By order entered September 7, 1989, Cheng's appeals of the abduction, robbery, conspiracy, and firearm convictions were certified from the Court of Appeals. We have consolidated these appeals with the capital murder appeal. Code § 17-116.06.

# II

## Facts

On September 3, 1988, Mohamad Amir, Dung Sam, and Samo Kim were with Cheng in Fairfax County. Amir overheard Cheng tell Sam and Kim that he was going to "do a restaurant." Amir

---

[1] Liu also was known as "Freddie" Liu.

[2] Code § 18.2-31(a) provides that "[t]he willful, deliberate and premeditated killing of any person in the commission of abduction . . . when such abduction was committed with the intent to extort money or a pecuniary benefit" shall constitute capital murder.

[3] Code § 18.2-31(d) provides that "[t]he willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon" shall constitute capital murder.

understood this to mean "robbing a restaurant." Cheng stated that he needed some money. However, he did not identify a particular restaurant or state when the act would occur.

The same day, while in a bathroom at Cheng's house, Amir saw a shotgun in a brown travel bag. A week earlier, Amir had seen Cheng with a .32 caliber semi-automatic pistol.

Later on September 3, Amir, Kim, Sam, and Cheng went to the Grand Garden Restaurant, in McLean. Liu was co-owner of the restaurant. Cheng handed a note to the receptionist and said, "Give this to Freddie." The restaurant manager was given a piece of paper either by the bartender or by Cheng and was told that it was for Liu. Later, the manager gave Cheng's note to Liu. Cheng's name and telephone number were written on the paper. The four men waited at the bar for approximately a half hour and then departed without seeing Liu.

The following day, the four men drove to Richmond. While they were returning to Arlington, Cheng said that he was going to rob a restaurant and told Sam and Kim to "bring the shotgun and the jeep."

The four men stopped at Sam's house where Sam got Cheng's jeep, a Mitsubishi Montero. They went to Cheng's house about 7:30 p.m. Cheng went into the house and, in two or three minutes, returned carrying a brown bag. Cheng put the bag in the jeep. It was the same bag in which Amir previously had seen the shotgun.

About 10:00 p.m., Cheng was seen at the Grand Garden Restaurant. He was alone. He talked with Liu for approximately five minutes and then left the restaurant.

At 11:25 p.m., Liu left the restaurant, carrying his briefcase. Liu got into his Cadillac automobile alone.

The next morning, Monday, September 5, 1988, between 7:30 and 7:40 a.m., an Arlington County employee discovered Liu's body at the entrance to Glen Carlin Park, in Arlington County. Liu's body was lying face-down on the floor between the front and rear seats of Liu's automobile. His head was resting on the floor behind the driver's seat. Liu's hands were tied behind his back with a necktie that apparently belonged to him. There was a substantial amount of blood on the backseat and on the rear floor.

Two .32 caliber cartridge casings were found beneath Liu's head. Another .32 caliber cartridge casing was found on the rear seat, and a fourth was found on the rear deck behind the rear seat. An investigating police officer concluded that the cartridges

had been fired by an automatic pistol. The officer also opined that, because most automatic pistols eject spent cartridges to the right, two shots probably were fired from the front seat, the casings being ejected onto the floor, and the other two shots probably were fired from a position outside the vehicle and above Liu, the casings being ejected onto the rear seat and the deck.

An autopsy revealed that Liu had been shot four times. However, it was not possible to determine the sequence in which the four bullets had been fired.

One bullet entered Liu's left cheek below the eye, traveled backward and downward, and lodged in the soft tissue of the neck. This bullet was recovered by the medical examiner. Another bullet entered the left side of Liu's neck, traveled backward and downward, and was recovered from his left upper back. These wounds were not lethal.

A third bullet entered the right side of Liu's face in front of the ear, traveled backward and upward through the brain, and exited the left rear of the head. The fourth bullet entered the right back portion of the head, passed forward and upward through the brain, and exited through the upper left forehead. These were fatal wounds.

A blood-soaked piece of paper was found on the rear floor of the automobile beneath Liu's head. A list of names and telephone numbers of employees at Liu's restaurant was on one side of the paper. A restaurant employee had written the names and numbers. On the other side of the piece of paper was written "SCF382 Va. Dung Q. Cheng 4652 Charl 522-5465." Cheng lived at 4642 Carlton Court, in Woodbridge, and owned an automobile with license number SCE-382.

The police found a Marlboro cigarette butt and less than one full cigarette's ashes in the dashboard ashtray of the Cadillac. Cheng smokes Marlboro cigarettes.

The police found no money in the automobile, and Liu's keys, briefcase, and wallet were missing. The left rear pocket of Liu's pants had been turned inside out and was empty. A Rolex watch remained on Liu's wrist.

The police dusted the interior and exterior of Liu's automobile for fingerprints and recovered only one partial, and unidentified, print from the exterior. From this, the police concluded that the interior of the automobile had been "wiped clean" after the murder.

On September 7, the Arlington County police found Cheng's jeep parked in Chinatown, in Washington, D.C. Its doors were locked. The police impounded and searched the vehicle. The police seized a shotgun from under the rear seat, an American Express Company credit card receipt signed by Liu from the front passenger floorboard, a Marlboro cigarette box from between the two front seats, and a briefcase from the front floorboard. The police also seized two knives, a martial arts weapon, a pellet gun, and a roll of black electrical tape. The shotgun was loaded with four shotgun shells, and the gun's safety catch was disengaged.

On September 9, Suwit Yon Kwan, an Arlington County deputy sheriff, saw Cheng in jail. Kwan and Cheng had been friends five or six years earlier when they were co-workers at a restaurant. Kwan testified that he asked Cheng, "[W]hat happened. What are you doing?", and that Cheng replied that "he didn't do it."

Kwan further testified that Cheng later told him that Cheng wanted to confess, and that he advised Cheng to talk to a lawyer first. Kwan testified that Cheng then told him that "he had to do it because [Liu] had put the contract on [Cheng]." Cheng also said, "[Y]ou guys are not going to find anything because . . . the only thing [I] left in [the Cadillac] was from a cigarette."

## III

### *Shotgun Issues*

Prior to trial, Cheng moved to sever the indictment for possession of a "sawed-off" shotgun from the other indictments. The trial court denied the motion. At trial, the court admitted the shotgun into evidence over Cheng's objection. Cheng assigns error to both rulings.

A court may direct that an accused be tried at one time for all offenses pending against him if (1) "justice does not require separate trials," Rule 3A:10(b), and (2) "the offenses are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan," Rule 3A:6(b). Whether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court. *Fincher* v. *Commonwealth*, 212 Va. 552, 553, 186 S.E.2d 75, 76, *cert. denied*, 409 U.S. 913 (1972); *Bryant* v. *Commonwealth*, 189 Va. 310, 315, 53 S.E.2d 54, 56 (1949). Thus, a trial court's ruling on the matter will not be reversed absent a

showing that the court abused its discretion. *Fincher*, 212 Va. at 553, 186 S.E.2d at 76.

▇ Generally, evidence of other offenses is inadmissible if it is offered merely to show that an accused was likely to commit the crime for which he is being tried. There are, however, well-established exceptions to the general rule.

> Evidence of other offenses is admitted if it shows the conduct and feeling of the accused toward his victim, if it establishes their prior relations, or if it tends to prove any relevant element of the offense charged. Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial.

*Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). *See also Spencer* v. *Commonwealth*, 240 Va. 78, 393 S.E.2d 609 (1990), this day decided.

In the present case, Cheng, Sam, and Kim planned to commit a robbery. In furtherance of the plan, Cheng told Sam and Kim to "bring the shotgun and the jeep." Consequently, on the evening of September 4, a bag containing the shotgun was placed in Cheng's jeep. The abduction, robbery, and murder of Liu occurred between 11:25 p.m., September 4, and 7:30 a.m., September 5. On September 7, the shotgun was found in Cheng's locked jeep.

▇ Clearly, the shotgun possession offense and the other offenses were connected and constituted parts of a common scheme or plan. In addition, on this record, we conclude that no undue prejudice could have resulted from trying the offenses together in a single trial. Therefore, the trial court did not abuse its discretion in refusing to sever the shotgun possession offense.

▇ It is equally clear that the shotgun was admissible evidence in the trial of the other offenses. It showed Cheng's motive, intent, and knowledge. Furthermore, this evidence was relevant to establish malice and premeditation, it was connected with and led up to the other offenses, and it was relevant as part of Cheng's general criminal scheme.

## IV

### *Admissibility of Cheng's Confession*

Cheng contends that the trial court erred in refusing to suppress incriminatory statements he made to Officer Kwan. Cheng claims that Kwan should have advised Cheng of his rights according to *Miranda* v. *Arizona*, 384 U.S. 436 (1966), before Kwan questioned him.

The record discloses that on September 8, shortly after Cheng had been taken into police custody, Officer Carter advised Cheng of his *Miranda* rights and that Cheng acknowledged his understanding. Thereafter, Cheng elected to talk with Carter and gave the officer a non-incriminating statement. The two-hour interrogation ended about midnight.

About 9:00 a.m. the next day, Officer Kwan, while performing certain duties at the county jail, encountered Cheng. Kwan recognized Cheng because of their prior association.

Kwan asked Cheng, "What happened?" Cheng first responded that "he didn't do it." Later, Cheng told Kwan that he wanted to confess, and Kwan advised him to talk first with a lawyer. Cheng, however, proceeded to tell Kwan that he "had to do it because the man had put the contract on him."

In *Washington* v. *Commonwealth*, 228 Va. 535, 548-49, 323 S.E.2d 577, 586 (1984), *cert. denied*, 471 U.S. 1111 (1985), we held that

> where a person, after receiving *Miranda* warnings, has once given a knowing and intelligent waiver of his constitutional rights, such waiver will be presumed to continue in effect throughout subsequent custodial interrogations until the suspect manifests, in some way which would be apparent to a reasonable person, his desire to revoke it.

An express written or oral statement of waiver of rights is not required. *North Carolina* v. *Butler*, 441 U.S. 369, 373 (1979). Waiver can be inferred from the actions and words of the person interrogated. *Id.*

In the present case, Cheng's decision to talk with Officer Carter, after having been advised of the *Miranda* rights, constitutes an implied waiver of those rights. Cheng never manifested a desire to revoke the waiver at anytime thereafter. He never ex-

pressed a desire to talk with an attorney. We conclude, therefore, that Cheng's incriminatory statements were made freely and with full knowledge of his *Miranda* rights.

## V

### *Proof of Venue of the Non-Capital Offenses*

Cheng contends that the Commonwealth failed to prove that the robbery, abduction, use of a firearm, and conspiracy occurred in Arlington County. These venue issues were submitted to the jury under an instruction offered by Cheng.[4] We must determine, therefore, whether the evidence, when viewed in the light most favorable to the Commonwealth, is sufficient to support the jury's venue findings.

Ordinarily, a criminal case must be prosecuted in the county or city in which the offense was committed. Code § 19.2-244. To prove venue, the Commonwealth must produce evidence sufficient to give rise to a "strong presumption" that the offense was committed within the jurisdiction of the court, and this may be accomplished by either direct or circumstantial evidence. *Pollard v. Commonwealth*, 220 Va. 723, 725, 261 S.E.2d 328, 330 (1980); *Keesee v. Commonwealth*, 216 Va. 174, 175, 217 S.E.2d 808, 809-10 (1975).

## A

### *Robbery*

The robbery indictment charged that Cheng robbed Liu of "keys, a wallet and a briefcase and the contents thereof." Liu was last seen alive about 11:25 p.m. on September 4, in McLean, in

---

[4] The instruction reads as follows:

INSTRUCTION NO. I

You are instructed that in proving the crimes charged in each indictment except capital murder and conspiracy, the Commonwealth must present evidence sufficient to create a strong presumption that the place where the crimes were committed was in Arlington County, Virginia. If the Commonwealth fails to prove this element of any of the crimes charged against the defendant except murder or conspiracy, then you must find him not guilty.

The crime of murder may be prosecuted wherever the body of the victim is found.

The crime of conspiracy may be prosecuted wherever any act is done toward the consummation of the conspiracy.

Fairfax County. He was driving his Cadillac automobile in which he had placed his briefcase.

Approximately eight hours later, his body was found in his car in Arlington County. Liu's left rear pant pocket, where he generally carried his wallet, had been emptied and turned inside out. His car keys and briefcase were missing.

From this evidence, the jury reasonably could have inferred that Liu's keys were used to drive the Cadillac into Arlington County and that they were stolen after the automobile was parked in the county. Clearly, therefore, the evidence is sufficient to give rise to a "strong presumption" that the robbery occurred in Arlington County.

## B

### *Abduction*

 The abduction indictment charged that, by the use of force, intimidation, or deception, and without legal justification or excuse, Cheng "did detain, seize, take, transport or secrete" Liu with intent to derive pecuniary benefit. The abduction statute, Code § 18.2-47, "casts its several prohibited acts in the disjunctive, [and therefore,] each is independently sufficient to support a conviction." *Scott* v. *Commonwealth*, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984).

The jury reasonably could have inferred from the evidence that Liu was detained, seized, or transported in Arlington County. Thus, we hold that the evidence is sufficient to support the jury's finding that the abduction occurred, in whole or in part, in the county.

## C

### *Use of a Firearm*

 We also are of opinion that the evidence gives rise to a "strong presumption" that the firearm was used in Arlington County. Based upon the location of the wounds, the bullets, and the cartridge casings, as well as the condition of Liu's automobile, the jury reasonably could have inferred that a .32 caliber pistol was used while the automobile was parked in the county.

## D

### *Conspiracy*

██ The conspiracy indictment charged that Cheng did conspire with others to commit "robbery, abduction, and/or murder." Code § 18.2-22(c) provides that "[j]urisdiction for the trial of any person accused of a conspiracy . . . shall be in the county . . . wherein any part of such conspiracy is planned or *in the county . . . wherein any act is done toward the consummation of such plan or conspiracy.*" (Emphasis added.)

As previously stated, the evidence is sufficient to give rise to a "strong presumption" that the robbery and abduction were committed in Arlington County. It follows, therefore, that, pursuant to Code § 18.2-22(c), Arlington County was a proper venue for the trial of the conspiracy indictment.

## VI

### *Prosecutor's Alleged Misconduct*

Cheng assigns error to two rulings made by the trial court during the Commonwealth's rebuttal argument. Cheng contends that the trial court erred in allowing the Commonwealth to argue "the content of a transcript of a tape recorded statement ruled inadmissible during the evidentiary portion of the trial." Cheng, however, neither requested a cautionary instruction nor moved for a mistrial.

Cheng also claims that the trial court erred in overruling his objection to the Commonwealth's Attorney's actions in disassembling the "sawed-off" shotgun during rebuttal argument. Cheng again failed to request a cautionary instruction, and he waited until the jury had retired before moving for a mistrial.

██ It is well-settled that errors assigned because of a prosecutor's alleged improper comments or conduct during argument will not be considered on appeal unless an accused timely moves for a cautionary instruction or for a mistrial. The motions must be made timely if the accused desires to take advantage of his objection on appeal. *Jackson* v. *Commonwealth*, 193 Va. 664, 674-75, 70 S.E.2d 322, 328 (1952). *Accord Blount* v. *Commonwealth*, 213 Va. 807, 811, 195 S.E.2d 693, 696 (1973); *Price* v. *Commonwealth*, 213 Va. 113, 121, 189 S.E.2d 324, 330 (1972); *Hubbard* v. *Commonwealth*, 190 Va. 917, 931, 59 S.E.2d 102, 109 (1950);

*Compton* v. *Commonwealth*, 190 Va. 48, 57, 55 S.E.2d 446, 450 (1949). A motion for a mistrial is untimely and properly refused when it is made after the jury has retired. *Price*, 213 Va. at 121, 189 S.E.2d at 330; *Russo* v. *Commonwealth*, 207 Va. 251, 257, 148 S.E.2d 820, 825 (1966), *cert. denied*, 386 U.S. 909 (1967).

In the present case, these alleged errors were not preserved at trial. Accordingly, we will not consider them on appeal.

## VII

### *Evidence Seized From Cheng's Vehicle*

Cheng claims that the trial court erred in admitting the evidence seized from his jeep two days after Liu's body was discovered. Cheng asserts that without proof of how and when the vehicle got to where it was found, of when the items were placed in the vehicle, and of "any other 'links' in the chain of evidence," the admission of the items was improper in violation of the rule of *Stover* v. *Commonwealth*, 222 Va. 618, 283 S.E.2d 194 (1981), and *Bishop* v. *Commonwealth*, 227 Va. 164, 313 S.E.2d 390 (1984). We do not agree.

Cheng's reliance upon *Stover* and *Bishop* is misplaced. Those cases set forth the standards of proof required to support a criminal conviction when the evidence is *wholly* circumstantial. They do not address the admissibility of evidence.

"[E]very fact, however remote or insignificant, that tends to establish a probability or improbability of a fact in issue is admissible." *Stamper* v. *Commonwealth*, 220 Va. 260, 269, 257 S.E.2d 808, 815 (1979), *cert. denied*, 445 U.S. 972 (1980). Of course, the weight to be given such circumstantial evidence is an issue for the jury. *Rees* v. *Commonwealth*, 203 Va. 850, 869, 127 S.E.2d 406, 419 (1962), *cert. denied*, 372 U.S. 964 (1963).

The seized items tended to connect Cheng with the crimes. Thus, this evidence was relevant and admissible.

## VIII

### *Other Matters*

Cheng contends that the trial court erred in allowing certain testimony by a police officer in rebuttal. Cheng argues that the testimony was improper because it rebutted the Commonwealth's, not Cheng's, evidence.

"[T]he time and manner of the introduction of evidence lies within the sound discretion of the trial court, and in the absence of abuse of this discretion resulting in prejudice to [the] defendant's case," the court's ruling will not be reversed on appeal. *Virginian Railway* v. *London*, 148 Va. 699, 716, 139 S.E. 328, 333 (1927); *accord Quintana* v. *Commonwealth*, 224 Va. 127, 142, 295 S.E.2d 643, 650 (1982), *cert. denied*, 460 U.S. 1029 (1983). The record does not disclose either an abuse of discretion by the trial court or any resulting prejudice to Cheng.

Cheng also contends that the trial court abused its discretion in failing to grant a mistrial for alleged improper remarks made by the Assistant Commonwealth's Attorney. During defense counsel's cross-examination of Officer Kwan, the Assistant Commonwealth's Attorney repeatedly stated in the jury's presence that defense counsel was misrepresenting the contents of a transcript of Kwan's tape-recorded statement. Cheng claims the motion should have been granted, "particularly in view of the lack of prompt corrective action by the trial court." We do not agree.

Cheng did not seek "prompt corrective action" by requesting a cautionary instruction concerning the alleged improper remarks. A trial court is not required to give a cautionary instruction *sua sponte*; rather, a defendant must request such an instruction where appropriate. *Clanton* v. *Commonwealth*, 223 Va. 41, 54, 286 S.E.2d 172, 179 (1982).

More to the point, whether a trial court should grant a mistrial is a matter resting within its discretion, and absent a showing of abuse of discretion, the court's ruling will not be disturbed on appeal. *Clinton* v. *Commonwealth*, 204 Va. 275, 280, 130 S.E.2d 437, 441 (1963). In the present case, we conclude that the trial court did not abuse its discretion in denying the motion.

A number of assignments of error are procedurally barred. Assignments of Error 8 and 12[5] concern the testimony of three prospective witnesses. However, Cheng neither attempted to call

---

[5] These assignments of error read as follows:

8. The Court erred in refusing to allow Counsel for the Defendant to call as witnesses, the co-defendants to stand in the presence of the jury, because of statements from the co-defendants' attorneys that they would in fact take the "fifth" amendment if called to the witness stand.

12. The Commonwealth Attorney engaged in prosecutorial misconduct, when he advised the Defendant that if he called a Mr. Jim Hite, as his witness, then he would ask Mr. Hite whether it was true he was a homosexual who gave drugs to the Defendant as payment for sexual favors.

the witnesses nor proffered the contents of their testimony. Therefore, these assignments will not be considered for want of an adequate record. *See Spencer* v. *Commonwealth*, 238 Va. 563, 570, 385 S.E.2d 850, 854 (1989), *cert. denied*, 493 U.S. ____, 110 S.Ct. 1171 (1990); *Spencer* v. *Commonwealth*, 238 Va. 295, 305-06, 384 S.E.2d 785, 792 (1989), *cert. denied*, 493 U.S. ____, 110 S.Ct. 1171 (1990); *Wyche* v. *Commonwealth*, 218 Va. 839, 842, 241 S.E.2d 772, 775 (1978); *Whittaker* v. *Commonwealth*, 217 Va. 966, 968-69, 234 S.E.2d 79, 81 (1977).

■ Additionally, Cheng neither briefed nor argued orally Assignments of Error 10, 13, 15, 16, 18, 20, 21, and 22.[6] Therefore, we will not consider them on appeal. Rule 5:27(e); Savino v. *Commonwealth*, 239 Va. 534, 547, 391 S.E.2d 276, 283 (1990).

■ Finally, Cheng contends, on brief, that the trial court erred in refusing Jury Instruction "O." Cheng, however, did not assign error to this ruling, and we will not consider it on appeal. Rule 5:25.

---

[6] These assignments of error read as follows:

10. The Court erred in allowing Officer Steven Deprenda to testify as an expert witness in the area of firearms.

13. The Court erred in allowing the Commonwealth Attorney to consistently lead the Commonwealth's witness, to wit: Mohammed Amir, regarding his association with the Defendant.

15. The Court erred in allowing the Commonwealth to elicit testimony concerning a handgun allegedly possessed by the Defendant a week before the homicide in question.

16. The Court erred in allowing the Commonwealth to present a handgun to the Commonwealth's witness, to wit: Mohammed Amir, and allowing him to say that said gun was identical to the one possessed by the Defendant, said actions being improper use of demonstrative evidence.

18. The Court erred in allowing into evidence a photograph of an alleged shotgun case allegedly seized from Linda Nguyen's house.

20. The Court erred in allowing one Julian J. Mason, Jr., to testify concerning the statutory requirements defining a shotgun pursuant to Section 18.2-299 of the Code of Virginia, as amended.

21. The Court erred in allowing the Commonwealth to recall Detective Steve Carter as a witness after he was excused as such.

22. The Court erred in refusing to allow the Defendant to amend an improperly drafted jury instruction.

## IX

### Sufficiency of the Evidence to Support a Capital Murder Conviction

 Except in the case of murder for hire, "only the actual perpetrator of the crime may be convicted of capital murder." *Johnson* v. *Commonwealth*, 220 Va. 146, 149, 255 S.E.2d 525, 527 (1979), *cert. denied*, 454 U.S. 920 (1981). Thus, neither an accessory before the fact nor a principal in the second degree may be so convicted. *Coppola* v. *Commonwealth*, 220 Va. 243, 256, 257 S.E.2d 797, 806 (1979), *cert. denied*, 444 U.S. 1103 (1980). This rule is mandated by statute:

In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree; provided, however, that *except in the case of a killing for hire under the provisions of § 18.2-31(b) an accessory before the fact or principal in the second degree to a capital murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree.*

Code § 18.2-18 (emphasis added).
 The Commonwealth has the burden of proving beyond a reasonable doubt that one accused of capital murder was the actual perpetrator of the crime. Suspicion of guilt, however strong, or even a probability of guilt, is insufficient to support a conviction. *Bishop*, 227 Va. at 170, 313 S.E.2d at 393; *Stover*, 222 Va. at 624, 283 S.E.2d at 197; *Webb* v. *Commonwealth*, 204 Va. 24, 34, 129 S.E.2d 22, 29 (1963).
 When the sufficiency of the evidence is an issue on appeal, an appellate court must view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth. *Stockton* v. *Commonwealth*, 227 Va. 124, 145-46, 314 S.E.2d 371, 385, *cert. denied*, 469 U.S. 873 (1984). Thus, a trial court's judgment should be affirmed unless the evidence does not support it. *Id.*
 Cheng contends that the evidence is insufficient, as a matter of law, to support a conviction of capital murder. He says that "the evidence at best shows that he was involved in the homicide."

Cheng asserts that the evidence is insufficient to prove that he fired the shots that killed Liu.

The evidence shows that Cheng "masterminded" the criminal plan. He expressed an intent to commit robbery. He directed his accomplices to obtain the "sawed-off" shotgun. He was seen talking with Liu on the evening Liu was last seen alive. He possessed a .32 caliber semi-automatic pistol — the type weapon used to kill Liu. Additionally, Cheng made incriminating statements to Officer Kwan. Clearly, the evidence is sufficient to support a finding that Cheng was a principal in the second degree to a capital murder.

The crucial question, however, is whether all the circumstances, coupled with Kwan's testimony, are sufficient to prove beyond a reasonable doubt that Cheng actually fired the fatal shots. In his direct testimony, Kwan stated that "[Cheng] told me that there's a man who put the contract on him and *they* had to get rid of him." (Emphasis added.) On cross-examination, Kwan, reading from a transcript of his prior testimony, stated, "[Cheng] did not say *direct* that he [was] involved with the crimes, but he told me that *he* had to do it because the man had put the contract on him." (Emphasis added.)

It is not surprising that Kwan was uncertain as to Cheng's exact words because Kwan neither recorded nor made notes of Cheng's statements. More remarkably, Kwan did not press Cheng to state who fired the fatal shots.

Could the jury reasonably and fairly have inferred from the statement, "he had to do it," that Cheng fired the fatal shots? Even when viewed in light of all the surrounding circumstances, we do not think such an inference is justified, especially when there were three known participants in the crimes.

The evidence, at most, creates a strong suspicion that Cheng was the "trigger man." As previously stated, however, suspicion of guilt, *no matter how strong*, is insufficient to sustain a criminal conviction. *Stover*, 222 Va. at 624, 283 S.E.2d at 197. Accordingly, we hold that the evidence is insufficient to support Cheng's conviction of capital murder.

# X

## Conclusion

We find no reversible error in the non-capital convictions (Record No. 891098), and therefore we will affirm those judgments. Because the evidence is insufficient to support a conviction of capital murder, we will reverse that judgment (Record No. 891096) and remand the case for a new trial for an offense no greater than murder in the first degree.

Record No. 891096 — *Reversed and remanded.*
Record No. 891098 — *Affirmed.*

JUSTICE COMPTON, with whom CHIEF JUSTICE CARRICO and JUSTICE HASSELL join, dissenting in part.

I disagree with the majority's conclusion that the evidence was insufficient to support the capital murder conviction. Rather, I am of opinion that when the rules of appellate review are applied properly to this evidence, the conviction and sentence to death must be affirmed.

We have said repeatedly that "when the sufficiency of the evidence is challenged on appeal, the evidence and all reasonable inferences fairly drawn therefrom must be viewed in the light most favorable to the. Commonwealth. The trial court's judgment should be affirmed unless it appears that it is plainly wrong or without evidence to support it." *Spencer* v. *Commonwealth*, 238 Va. 275, 283, 384 S.E.2d 775, 779 (1989), *cert. denied*, 493 U.S. ____, 110 S.Ct. 759 (1990).

The crucial issue on sufficiency of the evidence is, of course, whether the defendant was the "triggerman." The defendant confessed to Deputy Kwan that "he had to do it because the man had put the contract on him." Reasonably to be inferred from this undisputed evidence is that "it" meant the actual shooting of the victim and that defendant "had to do it" because of "the contract" that the victim "had put" out on defendant. Even though a fact finder is entitled to draw different inferences from this evidence, the appellate reviewer is not entitled to make such a choice once the jury has selected the inference supporting guilt. When this evidence is viewed upon appeal in the light most favorable to the Commonwealth, there is but one conclusion which should be

drawn — the defendant pulled the trigger and fired the shots causing the victim's death.

The majority says, "It is not surprising that Kwan was uncertain as to Cheng's exact words because Kwan neither recorded nor made notes of Cheng's statements." That idea merely affects the weight of the evidence, a consideration appropriate for a fact finder but inappropriate upon appellate review.

The majority also says, "More remarkably, Kwan did not press Cheng to state who fired the fatal shots." This, too, affects the weight of the evidence. More importantly, however, the reason Kwan did not press further was probably because he was satisfied from what the defendant already had said that the defendant had admitted firing the fatal shots. At any rate, the several inferences flowing from Kwan's conduct, as shown by the evidence, were for the jury, and not this Court, to determine.

Given the prior connections between the victim and the defendant, and the other circumstantial evidence pointing unerringly to the defendant as the perpetrator of the capital murder, I submit that the evidence is wholly sufficient to support the conviction.